UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREW RACHAL,

          Plaintiff,

    v.

ROBERT W. FOX,

          Defendant.

Case No.  17-cv-01254-PJH

**ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 22

    Before the court is the first amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by represented state prisoner Andrew Mark Rachal and the memorandum of points and authorities in support thereof.  See Dkt. 23 ("Pet.").  The briefs are fully submitted and the court determines that the matter is suitable for decision without oral argument.  Having reviewed the parties' papers and the record, and having carefully considered the relevant legal authorities, the court DENIES the petition.

<b>BACKGROUND</b>

**A.    Factual Summary**

    **1.    California Court of Appeal Summary of Facts Introduced at Trial**

    The following summary of facts is taken from the decision by the California Court of Appeal on Rachal's direct appeal, based on evidence presented at Rachal's trial, which resulted in a conviction on August 13, 2013.  See Pet., Ex. B, Reporter's Transcript on Appeal from the Judgment of the Superior Court ("RT") at 3604 (date of verdict).[1]

---

[1] This order refers to page numbers in the original document when available as in, e.g., state court opinions and orders.  Otherwise, and where original pagination is unclear, this

On May 10, 2011, Ricky Patterson suffered multiple stab wounds at defendant's residence, and he subsequently died. Defendant's neighbors had heard cries for help coming from defendant's house, and they saw defendant come out of his house and drive away. The next day, defendant fell or jumped off of a highway overpass in Santa Barbara County, resulting in serious injuries.

*A. Defendant's Relationship with Patterson*

Patterson was an unlicensed contractor. In late 2010 and early 2011, Patterson was working with Kevin Johnson, another unlicensed contractor. Patterson and Johnson worked on various projects for Ronald Willoughby, who owned property in Berkeley. One of the projects required a licensed general contractor, so Patterson proposed that Willoughby hire defendant, who had his contractor's license. Willoughby, his wife, defendant, Patterson, and Johnson subsequently agreed that Johnson would do the painting and drywall, Patterson would do carpentry and some other work, and defendant would "run the whole thing."

During the weeks before Patterson's death, Patterson and Johnson were working together on a different project. They commuted to the job site together in Patterson's truck. During the commutes, Johnson often heard phone conversations between defendant and Patterson. Patterson would put his cell phone on speaker, so Johnson heard both sides of the conversations.

One month or more before Patterson's death, Johnson overheard defendant tell Patterson that he was not going to use Patterson or Johnson for the Willoughby job. Johnson later overheard defendant say that he had started the job. He also heard Patterson tell defendant that the Willoughbys wanted their money back, referring to a $10,000 deposit or down payment.

At some point after learning that defendant was not going to use him for the Willoughby job, Johnson spoke to defendant on the phone. They argued, and defendant hung up on Johnson. Defendant then called Johnson back. Defendant said he did not have a problem with Johnson; his issues were with Patterson. Defendant told Johnson that he "could kill" Patterson.

Johnson never told Patterson about defendant's statement, but he did advise Patterson to stay away from defendant. Johnson also advised Patterson to stop being upset about defendant not using them for the Willoughby job. As recently as two days before the stabbing incident, Johnson had told Patterson to

_____

court refers to the page numbers stamped in the lower righthand corner of documents, as in the Reporter's Transcript and Clerk's Transcript.  For example, RT page 3604 is found at this court's Docket Number 22-19 at ECF page 205.

United States District Court
Northern District of California

"leave it alone," but Patterson did not seem to be able to let it go.

According to Johnson, the arguments between defendant and Patterson were not just about the Willoughby job. Defendant and Patterson had "long-term issues," one of which involved Patterson getting defendant fired from being a supervisor at another construction job. The conversations he overheard included "argumentative words" and "bickering back and forth."

Between May 2, 2011 and May 10, 2011 (the day of the homicide), there were numerous phone calls between defendant's cell phone and Patterson's cell phone. There were seven calls on May 2, five calls on May 3, seven calls on May 4, three calls on May 5, no calls on May 6, 28 calls on May 7, four calls on May 8, six calls on May 9, and three calls on May 10.

*B. Testimony of Defendant's Neighbors*

Manuel Brillantes lived on defendant's street on May 10, 2011. Just before 3:00 p.m. that day, he heard cries for help and followed the sound. He encountered Phuong Phan, who lived next door to defendant. Phan had just returned home with two of her children and was in her driveway.

After confirming that Phan had also heard the cries for help, Brillantes walked towards defendant's house. Brillantes looked through a broken window and saw two men inside near the kitchen sink. Brillantes asked, "Is everything okay there?" He heard one of the men say, "Help, call 9-1-1." The man sounded weak and in pain. The second man said, "He's all right, he's all right." The second man was wiping something off of his hands.

Brillantes backed away from the house. He saw the garage door open, then saw a man in the driveway. Phan, who was in her driveway, saw that the person was defendant. Phan asked defendant, "Is he okay?" Defendant told her, "He's okay, he's okay." Defendant's hands were red, but he did not appear to be injured.

Meanwhile, Brillantes called 9-1-1. While on the phone with the dispatcher, Brillantes heard defendant say, "[H]e's all right, he's all right," and then saw defendant leave in a white truck. The white truck had been parked across defendant's driveway, blocking Patterson's burgundy truck, which was parked in defendant's driveway. Brillantes next saw a person standing up, then crawling, in defendant's garage.

Patterson was found lying on the ground in defendant's driveway, just outside of the garage, near the back of Patterson's own truck. Patterson was treated by paramedics and taken to the hospital, where he died.

*C. Defendant's Fall or Jump from the Overpass*

On the afternoon of May 11, 2011, Brian Kent and his wife were driving northbound on Highway 101 in Santa Barbara County. He saw a white truck come up behind him. The truck was speeding and almost hit Kent's car two times. Kent wanted to call 9-1-1, and his wife wanted to call the number on the side of the truck. Kent followed the truck as it took an exit and went onto an overpass.

The white truck stopped on the overpass. Defendant was inside the truck. He appeared to be doing something—possibly writing. After about two or three minutes, he drove forward, stopped again, got out, and walked to the overpass railing. Defendant "toppled over" the railing, with his body "almost straight as a board."

Ronald Jasso was also driving with his wife northbound on Highway 101 on May 11, 2011. Jasso saw defendant standing on the overpass. Defendant put his arms at his sides and "cartwheeled" over the railing. Defendant landed in the fast lane of the freeway, feet first, and then "crumpled." Jasso pulled over and went to see if defendant was okay. Defendant appeared to be unconscious at first, but he later tried to stand up and crawl toward the center of the fast lane. Jasso did not hear defendant say anything. Defendant was wearing clear plastic gloves on both hands.

Detectives from the Santa Barbara County Sheriff's Department searched defendant's truck, finding a note inside. The note included "$5,000 Ricky stole my money" and "Chanda was fucking not faithful." The note also listed a number of names of defendant's friends and family members. Defendant's truck also contained an empty Sominex box, Sominex pill wrappers, two empty Red Bull cans, and eight unopened cans of tuna fish.

*D. Patterson's Autopsy*

After his death, Patterson's body underwent an autopsy. The cause of Patterson's death was complications of multiple stab wounds of the head and extremities—in other words, extreme blood loss. Patterson had 31 penetrating stab wounds, one of which had transected a large vein and an artery. Seven of the stab wounds were one-half inch deep; all of the others were deeper.

Patterson had a stab wound near his shoulder that was over three inches long and one inch deep. He had a stab wound in the back of his head that was one and a half inches long and one inch deep. Patterson's skull had been chipped. This stab could have broken a knife blade.

Patterson had several stab wounds in his face. One was on the right side of his face, one was in his forehead, and one was on the left side of his face. He also had a stab wound near his left ear.

Patterson had a number of stab wounds in or around his left arm. A stab wound in his left shoulder was three inches deep; it had both entry and exit wounds. Another stab wound was below that one. He had three stab wounds in his left arm. One of those wounds was three inches deep and was "probably the most significant" of all his wounds; it was the one that had transected a major vein and an artery.

There were three stab wounds in Patterson's left hand, along with an incised wound on that hand. At least two of the stab wounds were in Patterson's palm. One of the stab wounds in that hand was four inches long.

Patterson had two stab wounds in his right arm. Stab wounds in the back of his right upper arm and in his right forearm were both three inches deep. There was one stab wound and one incised wound on his right hand.

The remaining stab wounds were all in Patterson's legs. Several of the stab wounds in his left leg were three or more inches deep. One of the stab wounds in Patterson's right leg was four inches deep, and another one had gone through his leg.

Patterson also had blunt force injuries to his forehead, the bridge of his nose, and to his chest. He had abrasions on his abdomen, back, and arm.

Patterson was five feet, 11 inches tall and weighed 262 pounds at the time of his death. Defendant was five feet, 10 inches tall and weighed 228 pounds.

*E. Defendant's Injuries*

Defendant's hands were photographed on May 12, 2011, when he was in the hospital. There were horizontal defects on four fingers of defendant's right hand. These appeared to be sharp force injuries, and they would have made it impossible for defendant to grip a knife handle. [n.2: "Defendant was right-handed."] Defendant had similar damage to the pinkie finger of his left hand. The injuries on defendant's hands were consistent with his hands sliding onto the blade of the knife after stabbing Patterson and hitting bone. The injuries could also have been defensive wounds.

*F. Evidence Found at Defendant's Residence*

Police investigators searched defendant's residence, where Patterson's burgundy truck was backed into defendant's driveway. There was a "club" locking device on the steering wheel of Patterson's truck, and the truck's doors were locked.

A knife handle with a broken blade, which contained blood, was found in a garbage can in the garage. A broken knife blade was found on the kitchen floor. A broken coffee pot was also found on the kitchen floor. When police first arrived, the faucet in the

kitchen sink was running. The bay window in the living room was broken, with a small kitchen drawer lodged in it. A chair in the dining room was overturned. A set of blinds in the bedroom was pulled down.

Blood was found in several locations throughout defendant's residence. The "bloodletting" had begun in the master bedroom, where a lot of blood was lost. There was blood on the bed, pillows, and carpet. There was also blood in the hallway leading out to the living room and kitchen, including handprints on the hallway walls. Some of the handprints were near the ground, indicating a person may have been crawling. Other hand prints were higher up, suggesting that a second person had walked through the hall. The higher handprints appeared to have been from someone who had blood on his or her hands but whose own hands were not cut. The lower handprints appeared to have been from someone who had "quite a volume" of blood on his hands.

In the living room, there were bloody footprints leading from the kitchen to the front door and back. There was a blood smear on the front door's dead bolt.

A large amount of blood was in the kitchen. Blood was smeared on cabinets, appliances, and the floor. Blood droplets were on top of the smears, indicating that someone bloody was "being smeared around on the floor" and someone else was bleeding on top. There was a large pool of blood under a kitchen counter, indicating that someone lost a lot of blood in that location. A blood smear on a kitchen cabinet suggested that something— such as a head or knee—had been hit repeatedly against it. The blood on the kitchen floor was consistent with Patterson being stabbed there, and higher spatter indicated that was where he was stabbed in the back of the head.

Blood spatter near a light switch in the entry to the garage from the kitchen was consistent with the hand injury defendant had suffered. Blood stains on the floor going into and through the garage were consistent with someone crawling.

A number of items in defendant's house were tested for DNA. Patterson was the major source of the DNA in samples taken from blood on the bedroom floor and from blood on items in the bedroom such as a quilt and two pillowcases. Patterson was also the source of the DNA in blood samples taken from the hallway. Samples of blood found in the kitchen contained mixtures of Patterson's DNA and defendant's DNA. Patterson's DNA was on the knife blade along with other DNA, which could have come from defendant. Defendant's DNA was on the knife handle, with Patterson as a possible contributor.

According to criminalist Cordelia Willis, the above evidence showed that defendant was not bleeding in the master bedroom, where there had been a struggle; he was injured in the kitchen, where there was a further struggle. The bloody footprints indicated that defendant had walked to the front door

and back after the struggle in the bedroom and before being injured in the kitchen.

There was no sign of forced entry into defendant's house, except where the police had broken down the front door. Patterson's cell phone was found on the floor of defendant's bedroom; it had Patterson's blood on it.

*G. Defense Testimony*

Timothy Sutherland was driving his motorcycle north on Highway 101 in Santa Barbara County on May 11, 2011 when he saw defendant lying in the roadway. Sutherland pulled over and went to see if defendant was okay. Defendant told him, "He had a knife. He came at me."

Forensic pathologist and consultant Dr. Judy Melinek testified that defendant's hand wounds appeared to be defensive injuries. She thought it was unlikely, but possible, that the wounds were caused by defendant's hand slipping onto the knife blade. She testified that if defendant had consumed the entire box of Sominex pills, he would have been disoriented and sleepy, and he possibly would have hallucinated and been delirious.

Private investigator Gregg Dietz took photos and video at defendant's residence. From the location where Brillantes claimed to have been standing when he looked inside, a person could not see into the kitchen.

Santa Barbara Deputy Sheriff David Valadez was one of the officers who responded to the scene of defendant's fall or jump from the overpass on May 11, 2011. Deputy Valadez had removed the plastic gloves from defendant's hands, although defendant had tried to prevent him from doing so by clenching his fists. Deputy Valadez did not know what had happened to the gloves.

Defendant did not testify at trial.

*H. Prior Misconduct Evidence – Chanda McClendon*

Chanda McClendon had a two-year dating relationship with defendant that ended in May of 2011. At some point in April or May of 2011, defendant told McClendon, "I can't take too much or I'm going to snap," referring to "his pressures."

On May 2, 2011, McClendon was parking in a garage at her school when defendant showed up. Defendant blocked McClendon's car in with his white truck. He approached her, behaving "erratic" and "crazy." Defendant threatened to kill himself.

Later that same day, defendant again blocked McClendon's car, but he eventually allowed her to move her car. McClendon called 9-1-1 and drove towards a police station. Defendant

7

followed her and pulled up alongside her when she parked. McClendon subsequently obtained a restraining order.

A search of defendant's computer after the Patterson homicide showed that defendant had performed a number of Google searches following the McClendon incident. On May 2, 2011, defendant had searched for "how to commit suicide with sleeping pills." On May 4, 2011, defendant had searched for "how to get out of a restraining order." On May 6, 2011, defendant had performed a number of searches containing McClendon's name as well as searches such as "how to disguise your looks." On May 7, 2011, defendant had searched for "the death of Andrew Mark Rachal" and the definition of stalking.

*I. Prior Misconduct Evidence – Diane Williams and Gail Seahorn*

On March 28, 1998, San Jose Police officers were dispatched to a residence in response to a domestic dispute call. The officers contacted defendant and Diane Williams, and they handcuffed defendant. Defendant told an officer, "I was protecting her because someone attacked her." Defendant asked Williams not to press charges. While one officer filled out paperwork and the other spoke with Williams in another room, defendant tried to dive head-first through a second story window. In 1999, defendant was convicted of felony false imprisonment by violence against Williams as well as infliction of corporal injury on a spouse or cohabitant.

In 2004, defendant was convicted of false imprisonment by violence against Gail Seaton. No facts of that offense were introduced at trial.

Pet., Ex. C (found at Dkt. 22-20, hereafter the "Appellate Opinion") at 2–10.

This factual summary by the state court of appeal of the evidence presented at trial is presumed correct. See 28 U.S.C. § 2254(e)(1); Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009).

### 2. Petitioner's Introduction of New Facts Not Introduced at Trial

This court can consider new facts so long as they meet the standard outlined in 28 U.S. Code § 2254. The applicant can rebut a determination of a factual issue made by a state court "by clear and convincing evidence." 28 U.S. Code § 2254(e)(1).

Petitioner presents the following facts that were not introduced at trial, but which petitioner argues should have been introduced, as well as evidence produced during the evidentiary hearing in the Superior Court on the habeas proceeding brought at that level.

8

These assertions are presented in Rachal's petition and are "adduced from . . . declarations of Andrew Mark Rachal submitted in support of the superior court Petition for Writ of Habeas Corpus", as well as "recorded witness interviews taken by Santa Clara County District Attorney Investigator Kevin Coyne".  Pet. at 9 n.2 (citing Exs. D–G & J–K).

### a.    The Willoughby Job

Petitioner was asked by Ricky Patterson and Kevin Johnson to give an estimate for a friend to repair various parts of a building that sustained water damage.  Ultimately, Audrey Owens, the executor for Lorraine Owens, at the Owens Apartments in Berkeley, signed a contract for petitioner's company, R-Square Design and Construction Company, to do the work.  The plans were drawn, stamped, and approved and permits were given to start work.  The contract petitioner bid for was in the amount of $23,000 but it required Farmers Insurance approval before the work was to start.

Subsequently, the Farmers adjuster in the Claims Department approved the contract.  However, without petitioner's knowledge, it was approved for $33,000.  Petitioner learned later, after the Farmers investigation concluded, that Arcola Moore, Audrey's daughter, used the same contract letter head and repair list that he drafted, made a counterfeit copy, and forged petitioner's signature on it.  Ms. Moore also signed her grandmother's signature.

Prior to starting the job, petitioner met with Audrey Owens Willoughby at Wells Fargo Bank in Oakland, California to receive the first check.  This check was for $7,300.  At this point, petitioner had already started doing some preliminary work and was clocking company hours.  The next Monday, petitioner approached the Owens Apartment Complex when he was informed that there would be a delay in starting the work.  Petitioner asked the reason but was hung up on by Mr. Willoughby.

Within the next hour, Arcola Moore called petitioner and told him he was fired.  Petitioner asked to speak with Audrey Owens but Arcola replied that Audrey did not want to speak with him.  Petitioner then offered to send an invoice after he received a breach of contract notice.  Arcola stated she wanted a full refund but petitioner stated he would

1   give her $5,000.  Arcola subsequently stated that if they did not get a full refund, they

2   would call the contractor's board.

3       Next, petitioner signed over the copyrights to the architectural drawing to Lorraine

4   Owens on behalf of the property owners.  He contacted the building department to inform

5   them that he would not be doing the Owens project and that R-square Design would not

6   be liable for the work.  Petitioner told the Farmers adjuster he wanted something in

7   writing, so he stated that he would fax the contract to him.  Once the adjuster received

8   the contract, he contacted petitioner and stated that it was for $10,000 less than the

9   contract that was e-mailed by Arcola.  Petitioner later met with investigator Larry Shaffer

10  from Farmers, and it was confirmed that the contract they received from Arcola was a

11  counterfeit copy.  In March of 2011, the Farmers adjuster informed petitioner he was

12  cleared of any wrongdoing in this fraudulent insurance claim being pursued by the

13  Willoughbys.

### b.   May 9, 2011

15      On May 9, 2011, the night before the homicide, Patterson visited his long-time

16  friend, Steven Friendly, at his home.  Friendly stated that Patterson advised him that he

17  had come there after leaving petitioner's home.  While at Friendly's home, petitioner

18  called Patterson who put his phone on speaker allowing Friendly to hear the

19  conversation.  Friendly noted that he could tell petitioner was doing cocaine because he

20  sounded strange on the phone and he suspected Patterson was doing it with him before

21  coming over.  During the conversation, petitioner told Patterson that he wanted to go out

22  that night and "pick up on some women."  He wanted the two to "go out to the bars and

23  we gotta pick up women ... You're a pretty good lookin' guy ... you'll probably get anyone

24  you want ... you'd be surprised at what you could get."  Petitioner and Patterson spoke for

25  at least thirty minutes to discuss whether they should go to the bars together that night.

26      Friendly felt that petitioner was coming onto Patterson.  After the conversation

27  ended, Friendly told Patterson that it sounded like Rachal was making a move on him.

28  Patterson seemed to know what Friendly was talking about and stated that he had "been

United States District Court
Northern District of California

there before with [Rachal] with this kind of conversation" and that he was not worried about it.  Patterson stated he knew how to deal with it and "just kinda blew it off."

### c.   May 10, 2011

On the day of the homicide, Patterson woke up between 4:00 and 5:00 a.m. at the home of his girlfriend, Cora Coloma.  He told Coloma that he was going to San Francisco to pick up his check and then to petitioner's home to discuss a job.  Patterson left around 5:00 a.m.  At around 6:00 a.m. Patterson briefly returned to Friendly's to let him know that petitioner was going to help him on a job that Friendly had spoken to him about the previous night when they were together.

Patterson subsequently drove to the home of his ex-girlfriend, Sandy Tellez, to pick up his tools.  He arrived between 6:30 and 7:00 a.m.  Around 7:45 a.m., Coloma left to work when Patterson called her.  Patterson stated he was coming back from San Francisco and Coloma stated he left his car alarm key.  The two met near Blossom Hill Road.  Five minutes after leaving, Patterson called Coloma and stated he was going to petitioner's house.

After thirty minutes passed, Patterson called Coloma and stated "You know, Andrew is a gay, Cora."  Cora asked him, "What makes you say that?" Patterson responded, "I just left his house ... he tr[ied] to pull my pants and do me ... he's gay." Patterson continued, "I was so mad ... we had a fight because I [didn't] want to do it. That's why I left."

Patterson subsequently called Sandy Tellez and told her to open the garage door because he was on his way.  According to Tellez, Patterson sounded disturbed.  When he arrived to Tellez's home, Patterson exclaimed, "Sandy, you're not going to believe this!"  Tellez asked Patterson what was wrong.  Patterson responded, " I just came from Andrew's ... and he hit me up, you know ... and tried to pull my pants down."  Patterson showed Tellez scrapes on his forearms.  Patterson continued, "That effin' tried to eff me ... he pulled down my pants ... that effin pervert."  Tellez told Patterson to calm down and not to go back over to petitioner's.

Patterson described petitioner as "a mad man, on something ... not himself." According to Tellez, the sexual advances made by petitioner visibly disturbed Patterson. He had a look of hurt and devastation.  Patterson told Tellez he was not going to go back to petitioner's home but that he was going to tell everyone what had occurred.

After Patterson left Tellez's home, he went next door to Henry and Laura Alcantar's home.  According to Mrs. Alcantar, he arrived between 9 and 11 a.m.  His plan was to pick up Henry to go get a check for a job they finished.  Mrs. Alcantar described Patterson as anxious when he arrived.  Patterson told Mrs. Alcantar that "something just happened right now."  Mrs. Alcantar asked him, "What's going on?"  Patterson stated that one of his friends tried to make a pass at him.  He said "What the hell, I'm not freaking gay."  Patterson told Mrs. Alcantar that petitioner told him he has had a crush on him throughout the years.  Patterson subsequently stated again, "I'm not gay ... I've always had a woman ... Oh man ... I can't believe that."  According to Mrs. Alcantar, Patterson was in shock.  The Alcantars called Patterson 30-40 minutes later.  Patterson called back and said he was on his way back to their house but never showed up.

At 11:45 a.m., Patterson called Coloma and asked her to go to lunch.  Coloma was unable to go because she was meeting a friend at a restaurant.  At 12:11 p.m., Patterson called Friendly and left a message.  At 12:49 p.m., Friendly called Patterson back.  The two men never got in touch with each other.

**B.    Procedural History**

The Petition for Writ of Habeas Corpus stems from two state court actions brought on behalf of Rachal that were unsuccessful.

### 1.    State Court Trial and Direct Appeal

Petitioner was charged with murder arising out of the May 10, 2011, death of Ricky Patterson.  See Court of Appeal Sixth Appellate District Clerk's Transcript, Pet., Ex. A ("CT") at 426–28.  The information specifically charged petitioner Andrew Mark Rachal with murder in violation of California Penal Code section 187, with a weapon use allegation under section 12022(b).  Id.  Rachal pled not guilty.  Id. at 430.  On August 13,

1    2013, the jury found him guilty of murder, with a finding that it was in the first degree, and

2    found true the weapon enhancement.  RT 3604; CT 799–89.  On October 18, 2013, the

3    court sentenced Rachal to serve an indeterminate prison term of twenty-five years to life,

4    to be served consecutive to a one-year determinant term for a violation of section

5    12022(b)(1).  RT 3649; CT 1020–22.

6        On October 18, 2013, petitioner filed a notice of appeal.  CT 1023.  On

7    November 30, 2015, the California Court of Appeal upheld the judgment of conviction.

8    See Appellate Opinion at 1.  The California Supreme Court denied Rachal's petition for

9    review on March 9, 2016.  Pet., Ex. U.

10       **2.    State Court Habeas Proceedings**

11       On December 2, 2016, petitioner, through counsel, filed a habeas petition in Santa

12   Clara County Superior Court.

13       The Superior Court issued an order to show cause, and the district attorney filed a

14   return with exhibits.  On December 7 and 10, 2018, the Superior Court held an

15   evidentiary hearing at which petitioner and his trial counsel Mr. Lempert testified.  On July

16   2, 2019, the Superior Court denied the petition in a reasoned decision.  See Decision on

17   Writ of Habeas Corpus, Pet., Ex. N ("Sup. Ct. Habeas Decision").  On July 12, 2019, the

18   Superior Court filed an addendum to the decision.  See Addendum to Order Re: Habeas

19   Corpus, Pet., Ex. O.

20       On September 5, 2019, petitioner filed a habeas petition in the California Court of

21   Appeal.  At the appellate court's request (Pet., Ex. P), the state filed a response (Pet.,

22   Ex. Q), and petitioner filed a reply (Pet., Ex. R).  On June 10, 2020, the appellate court

23   summarily denied the petition.  Pet., Ex. S.

24       On August 7, 2020, petitioner filed a habeas petition in the California Supreme

25   Court.  On February 10, 2021, the California Supreme Court summarily denied the

26   petition.  Pet., Ex. T.

27       **3.    Federal Habeas Proceedings**

28       On March 9, 2017, petitioner filed a habeas petition in this court.  Dkt. 1.  He

13

1   sought a stay until the state courts had resolved his pending claims.  Dkt. 4.  On March 3,

2   2017, this court granted a stay pursuant to Rhines v. Weber, 544 U.S. 269 (2005).

3   Dkt. 9.

4          This court lifted the stay on March 10, 2021.  Dkt. 12.  On June 8, 2021, petitioner

5   filed the First Amended Petition.  Dkt. 22.  On September 29, 2021, this court ordered

6   respondent to show cause with respect to Rachal's following claims:

7          **Claim 1:**  There was a lack of sufficient evidence to convict Rachal of first degree

8   murder.

9          **Claim 2:**  The trial court violated Rachal's right to a jury trial by improperly

10  dismissing a juror.

11         **Claim 3:**  The trial court erred by failing to instruct the jury on a lesser included

12  offense.

13         **Claim 4:**  The trial court erred by failing to properly instruct the jury on the issue of

14  self-defense.

15         **Claim 5:**  The prosecution committed misconduct.

16         **Claim 6:**  Rachal's counsel's ineffective representation was a violation of his

17  constitutional right to counsel.

18         **Claim 7:**  The trial court improperly admitted evidence regarding petitioner's ex-

19  girlfriend.

20         **Claim 8:**  Rachal's trial counsel provided ineffective assistance by failing to

21  present all of the facts relevant to self-defense and to disprove the prosecution's

22  theory of motive.

23         **Claim 9:**  False testimony was allowed to be presented at trial.

24         **Claim 10:**  Trial counsel's decision to forgo manslaughter instructions was not

25  based on a rational and strategic decision.

26         **Claim 11:**  Cumulative constitutional errors caused petitioner undue prejudice.

27  Dkt. 25 at 2.

28

United States District Court
Northern District of California

1     Respondent filed an answer to the first amended petition on January 26, 2022.

2     Dkt. 28-1 ("Answer").  Rachal filed the traverse on July 14, 2022.  Dkt. 41 ("Traverse").

3     Rachal's habeas petition is now fully briefed, and the court determines that the matter is

4     suitable for decision without oral argument.

5                            **STANDARD OF REVIEW**

6     Under The Antiterrorist and Effective Death Penalty Act of 1996 ("AEDPA"), which

7     is applicable to any federal habeas petition filed after April 1, 1996, a district court may

8     not grant a petition challenging a state conviction or sentence on the basis of a claim that

9     was reviewed on the merits in state court unless the state court's adjudication of the

10    claim "(1) resulted in a decision that was contrary to, or involved an unreasonable

11    application of, clearly established Federal law, as determined by the Supreme Court of

12    the United States; or (2) resulted in a decision that was based on an unreasonable

13    determination of the facts in light of the evidence presented in the State court

14    proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

15    mixed questions of law and fact (Williams v. Taylor, 529 U.S. 362, 407–09 (2000)), while

16    the second prong applies to decisions based on factual determinations (Miller-El v.

17    Cockrell, 537 U.S. 322, 340 (2003)).

18    A state court decision is "contrary to" Supreme Court authority under § 2254(d)(1)

19    if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court

20    on a question of law or if the state court decides a case differently than [the Supreme]

21    Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412–13.  A

22    state court decision is an "unreasonable application of" Supreme Court authority if it

23    correctly identifies the governing legal principle from the Supreme Court's decisions but

24    "unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  A

25    federal court on habeas review may not issue the writ "simply because that court

26    concludes in its independent judgment that the relevant state-court decision applied

27    clearly established federal law erroneously or incorrectly."  Id. at 411.  Rather, the

28    application must be "objectively unreasonable" to support granting the writ.  Id. at 409.

United States District Court
Northern District of California

1     "A state court's determination that a claim lacks merit precludes federal habeas

2  relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

3  decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v.

4  Alvarado, 541 U.S. 652, 664 (2004)). "Evaluating whether a rule application was

5  unreasonable requires considering the rule's specificity.  The more general the rule, the

6  more leeway courts have in reaching outcomes in case-by-case determinations." Id.

7  (quoting Yarborough, 541 U.S. at 664). "As a condition for obtaining habeas corpus

8  [relief] from a federal court, a state prisoner must show that the state court's ruling on the

9  claim being presented in federal court was so lacking in justification that there was an

10  error well understood and comprehended in existing law beyond any possibility for

11  fairminded disagreement." Id. at 103.

12     Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

13  determination will not be overturned on factual grounds unless objectively unreasonable

14  in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at

15  340.  Review under § 2254(d)(1) is limited to the record that was before the state court

16  that adjudicated the claim on the merits.  Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

**DISCUSSION**

17

18  **A.     Claim 1:  Whether There Was a Lack of Sufficient Evidence to Convict**

19  **Rachal of First Degree Murder**

20     Rachal argues that the prosecution failed to present sufficient evidence for a jury

21  to convict him of first degree murder.

22     First, Rachal argues that because the issue of self-defense was properly

23  presented to the jury under CALCRIM No. 505 (Justifiable Homicide: Self-Defense or

24  Defense of Another) and CALCRIM No. 506 (Justifiable Homicide: Defending Against

25  Harm to Person Within Home or on Property) (RT 3390–95), the prosecution was

26  required to prove the absence of the self-defense justification in Rachal's home beyond a

27  reasonable doubt.  He argues that the state court's denial of his claim was an objectively

28  unreasonable application of Jackson v. Virginia, 443 U.S. 307 (1979), because no

United States District Court
Northern District of California

1   rational trier of fact could have found beyond a reasonable doubt that Rachal did not act

2   in self-defense and that he was not entitled to defend himself in his own home.

3       Second, petitioner argues that there was insufficient evidence presented for the

4   jury to find beyond a reasonable doubt that another essential element of first degree

5   murder was met:  that he committed the murder with premeditation and deliberation.

6       **1.    Legal Standard**

7       The Due Process Clause of the United States Constitution "protects the accused

8   against conviction except upon proof beyond a reasonable doubt of every fact necessary

9   to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364

10  (1970).  A state prisoner who alleges that the evidence in support of his state conviction

11  cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt

12  beyond a reasonable doubt therefore states a constitutional claim which, if proven,

13  entitles him to federal habeas relief.  Jackson, 443 U.S. at 321 & 324.

14      The Supreme Court has emphasized that "Jackson claims face a high bar in

15  federal habeas proceedings".  Coleman v. Johnson, 566 U.S. 650, 651 & 655 (2012) (per

16  curiam) (overruling court that "unduly impinged on the jury's role as factfinder" and failed

17  to apply the deferential standard of Jackson when it engaged in "fine-grained factual

18  parsing" to find that the evidence was insufficient to support petitioner's conviction).  A

19  federal court collaterally reviewing a state-court conviction does not assess for itself

20  whether the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982

21  F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993).  The federal court

22  "determines only whether, 'after viewing the evidence in the light most favorable to the

23  prosecution, *any* rational trier of fact could have found the essential elements of the crime

24  beyond a reasonable doubt.'"  Id. (quoting Jackson, 443 U.S. at 319); see also Coleman,

25  566 U.S. at 656 ("the only question under Jackson is whether [the jury's finding of guilt]

26  was so insupportable as to fall below the threshold of bare rationality").  Due Process is

27  violated only if no rational trier of fact could have found proof of guilt beyond a reasonable

28  doubt.  Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338; Miller v. Stagner, 757 F.2d

United States District Court
Northern District of California

17

988, 992–93 (9th Cir.), amended, 768 F.2d 1090 (9th Cir. 1985), cert. denied, 475 U.S. 1048, and cert. denied, 475 U.S. 1049 (1986); Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.), cert. denied, 469 U.S. 838 (1984).

"[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.  The court may not substitute its judgment for that of the jury.  See Coleman, 566 U.S. at 655–56 (lower court erred in finding that there was no reasonable basis for the jury's conclusion that petitioner had a specific intent to kill victim and force was used simply because there was no testimony describing physical action by petitioner).  Indeed, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Parker v. Matthews, 567 U.S. 37, 43 (2012) (per curiam) (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (lower court erred by substituting its judgment for that of California jury on the question whether the prosecution's or defense's expert witnesses more persuasively explained the cause of death)).  The court must also consider all of the evidence admitted at trial in light most favorable to the prosecution.  See McDaniel v. Brown, 558 U.S. 120, 133 (2010) (lower court erred by failing to consider all of the evidence in light most favorable to the prosecution when it resolved inconsistencies in testimony in favor of petitioner); see also LaMere v. Slaughter, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not confine its analysis to evidence presented by the state in its case-in-chief).

Under Jackson's standard of review, a jury's credibility determinations are entitled to near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not permit a federal habeas court to revisit credibility determinations.  See id.; see also Guam v. McGravey, 14 F.3d 1344,

1346–47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

"Uncontradicted testimony is not necessarily undisputed evidence. Jurors may reject uncontradicted testimony when cross examination, other evidence, or their own common sense and ordinary experience convince them the testimony is probably false. 'Even perfectly plausible allegations can be disbelieved if they occur during the course of a generally implausible account.'" United States v. Sandoval-Mendoza, 472 F.3d 645, 649 (9th Cir. 2006) (footnote omitted) (quoting Grotemeyer v. Hickman, 393 F.3d 871, 879 (9th Cir. 2004)).

Under the Jackson standard, a conviction may be supported by logical inferences from circumstantial evidence, but the inferences cannot be merely speculative. Sarausad v. Porter, 479 F.3d 671, 677 (9th Cir. 2007), rev'd on other grounds sub nom Waddington v. Sarausad, 555 U.S. 179 (2009); Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995); compare United States v. Begay, 673 F.3d 1038 1043-45 (9th Cir. 2011) (en banc) (evidence about defendant's activities and the manner of killing allowed inference of premeditation and is sufficient "because it is 'supported by a chain of logic,' which is all that is required to distinguish reasonable inference from speculation") with Juan H. v. Allen, 408 F.3d 1262, 1278-79 (9th Cir. 2005) (granting writ where, after resolving all conflicting factual inferences in favor of prosecution, only speculation supported petitioner's conviction for first degree murder under a theory of aiding and abetting). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" Coleman, 566 U.S. at 655 (quoting Jackson, 443 U.S. at 319).

Where behavior is consistent with both guilt and innocence, the burden is on the state to produce evidence that would allow a rational trier of fact to conclude beyond a reasonable doubt that the behavior was consistent with guilt; however, the "prosecution need not affirmatively rule out every hypothesis except that of guilt." Sarausad, 479 F.3d

1    at 678 (quoting Wright v. West, 505 U.S. 277, 296 (1992)).  The existence of some small

2    doubt based on an unsupported yet unrebutted hypothesis of innocence therefore is not

3    sufficient to invalidate an otherwise legitimate conviction.  See Taylor v. Stainer, 31 F.3d

4    907, 910 (9th Cir. 1994).

5         Under AEDPA, federal habeas courts must apply the standards of Jackson with an

6    additional layer of deference.  Juan H., 408 F.3d at 1274.  Generally, a federal habeas

7    court must ask whether the operative state court decision reflected an unreasonable

8    application of Jackson to the facts of the case.  Coleman, 566 U.S. at 651; Juan H., 408

9    F.3d at 1275.  Thus, if the state court affirms a conviction under Jackson, the federal

10   court must apply § 2254(d)(1) and decide whether the state court's application of Jackson

11   was objectively unreasonable.  See McDaniel, 558 U.S. at 132–33.  To grant relief,

12   therefore, a federal habeas court must conclude that "the state court's determination that

13   a rational jury could have found that there was sufficient evidence of guilt, i.e., that each

14   required element was proven beyond a reasonable doubt, was objectively unreasonable."

15   Boyer v. Belleque, 659 F.3d 957, 965 (9th Cir. 2011).

16        By contrast, § 2254(d)(2) is not readily applicable to Jackson cases, because a

17   court under Jackson makes no "determination of the facts" in the ordinary sense of

18   resolving factual disputes.  Sarausad, 479 F.3d at 678.  Rather, the court views the

19   evidence in the light most favorable to the prosecution without resolving any disputed

20   factual questions.  Id.  The federal court's task is not to decide whether the state court

21   unreasonably determined disputed facts; it is, rather, to decide whether the state court

22   unreasonably applied the Jackson test.  Id. at 683 (finding that while state court's

23   characterization of certain testimony was objectively unreasonable, its conclusion that the

24   Jackson standard was satisfied was not objectively unreasonable).  Federal courts

25   therefore "evaluate a state court's resolution of a Jackson sufficiency-of-the-evidence

26   claim in all cases under § 2254(d)(1) rather than § 2254(d)(2)".  Id. at 678.[2]

27

28   _____
     [2] The Ninth Circuit has adopted guidelines for applying the "objective unreasonableness"
     test under § 2254(d)(1) to a state court decision applying Jackson:  "(1) The focus of the

The <u>Jackson</u> standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.  <u>Jackson</u>, 443 U.S. at 324 n.16; <u>see also</u> <u>Boyer</u>, 659 F.3d at 968.  However, "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." <u>Coleman</u>, 566 U.S. at 655.  When a jury instruction incorrectly adds an additional element to the charged crime, "a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction."  <u>Musacchio v. United States</u>, 577 U.S. 237, 243 (2016).

In sum, sufficiency claims on federal habeas review are subject to a "twice-deferential standard."  <u>Parker</u>, 567 U.S. at 43.  A state court decision denying a sufficiency challenge may not be overturned on federal habeas unless the decision was "objectively unreasonable."  <u>Id.</u> (quoting <u>Cavazos</u>, 565 U.S. at 2).  That state court's inquiry asks whether, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Id.</u> (quoting <u>Jackson</u>, 443 U.S. at 319).

### 2.    Self-Defense

The parties agree that the prosecution was required to prove beyond a reasonable doubt that petitioner's use of deadly force was not justified under the California doctrines of self-defense and defending oneself within the home.  This court assesses whether the California Court of Appeal's decision that "*any* rational trier of fact could have found the

---

inquiry is on the state court decision; (2) Even with the deference due by statute to the state court's determinations, the federal habeas court must look to the totality of the evidence in evaluating the state court's decision; (3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable; (4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and (5) The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness."  <u>Sarausad</u>, 479 F.3d at 678 (quoting <u>Hurtado v. Tucker</u>, 245 F.3d 7, 18 (1st Cir. 2001)) (quotation marks omitted).

essential elements of the crime beyond a reasonable doubt" was "objectively

unreasonable."  Parker, 567 U.S. at 43.

The California Court of Appeal found that there was sufficient evidence for the jury

to conclude that petitioner's use of deadly force was not justified:

> A person has the right to use "all force necessary" in self-defense if, based on the "nature of the attack," a reasonable person would be "justified in believing that his [or her] assailant intends to commit a felony upon him [or her]." (*People v. Clark* (1982) 130 Cal.App.3d 371, 377 (*Clark*), overruled on other grounds by *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) When an intruder "unlawfully and forcibly enter[s]" a residence, there is "a rebuttable presumption that [the resident] was in reasonable fear of imminent danger when he [or she] used deadly force within his [or her] residence." (*People v. Brown* (1992) 6 Cal.App.4th 1489, 1496.)
>
> However, "a person may use only that force which is necessary in view of the nature of the attack; any use of excessive force is not justified and a homicide which results therefrom is unlawful. [Citation.]" (*Clark, supra*, 130 Cal.App.3d at p. 377.) "[A] person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that the nature of the attack did not justify the resort to deadly force or that the force used exceeded that which was reasonably necessary to repel the attack." (*Id.* at p. 380.)
>
> "When the issue of self-defense is properly presented in a homicide case, the prosecution must prove the absence of the justification beyond a reasonable doubt. [Citation.]" (*People v. Pineiro* (1982) 129 Cal.App.3d 915, 920.) "Issues arising out of self-defense, including whether the circumstances would cause a reasonable person to perceive the necessity of defense, whether the defendant actually acted out of defense of himself [or herself], and whether the force used was excessive, are normally questions of fact for the trier of fact to resolve. [Citations.]" (*Clark, supra*, 130 Cal.App.3d at p. 378.) However, a reviewing court may conclude that the prosecution failed to carry its burden to prove that a homicide was not justified if the evidence of adequate provocation or self-defense is " 'both uncontradicted and sufficient as a matter of law.' " (*Ibid.*) The issue is a question for the trier of fact "where some of the evidence tends to show a situation in which a killing may not be justified" or where "the evidence is uncontroverted, but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive." (*Id.* at p. 379.)
>
> Here, defendant contends the prosecution did not present sufficient evidence from which the jury could have concluded that defendant did not act in self-defense when he killed Patterson. In other words, defendant contends that the

evidence established he acted in self-defense as a matter of law. Defendant points out that there was evidence Patterson harbored "ill-will and animosity" towards him, that there was no evidence defendant had invited Patterson to his home, that the altercation apparently began in defendant's bedroom, and that defendant subsequently claimed that Patterson had come at him with a knife.

The question of whether defendant was entitled to use deadly force was a question for the jury because at least some of the evidence tended to show that the homicide was not justified and that "the force resorted to was excessive." (*Clark, supra*, 130 Cal.App.3d at p. 379.) The evidence showed that the violent altercation began in the bedroom, but the evidence did not necessarily support the defense theory that defendant had been sleeping or was taken by surprise by Patterson. Patterson—not defendant—was the major source of the blood in the bedroom, where a lot of blood was lost. The evidence indicated that defendant suffered the injuries to his hands later, in the kitchen, where there was a mixture of defendant's blood and Patterson's blood. Patterson's DNA was on the knife blade, and defendant's DNA was on the knife handle. Thus, the jury could reasonably conclude that defendant had the knife from the very beginning of the altercation and that he initiated the use of force. The evidence of the two sets of bloody handprints coming from the bedroom strongly indicated—in light of the DNA evidence—that Patterson crawled out of the bedroom, while defendant walked out, and that Patterson suffered additional injuries in the kitchen, including the injury to his head, which likely caused the high blood spatter in the kitchen and possibly caused the knife blade to break. The evidence established that Patterson was stabbed more than 30 times, all over his body. The presence of Patterson's cell phone on the bedroom floor, with Patterson's blood on it, suggested that Patterson may have tried to call 9-1-1 when he was still in the bedroom, prior to the additional stab wounds he suffered in the kitchen. Based on this evidence, the jury could reasonably conclude that defendant continued to stab Patterson at a time when Patterson was not a reasonable threat to defendant—i.e., that even if Patterson initiated the altercation, defendant used force in excess of "that which was reasonably necessary to repel the attack." (*Id.* at p. 380.)

Other evidence supported the jury's finding that defendant did not act in self-defense. Defendant's neighbors heard cries for help, and the jury could reasonably find that those cries came from Patterson, in light of the severity of his injuries in comparison to those suffered by defendant, who was able to walk out of the house and drive away. Additionally, when defendant saw his neighbors, he did not say that he had been attacked. Instead, defendant claimed that Patterson was "all right" and "okay," and he fled without calling the police.

On this record, a reasonable jury could have found beyond a reasonable doubt that defendant's use of deadly force was not justified. Substantial evidence supports the jury's finding that

United States District Court
Northern District of California

1
       the homicide was not justified.

2
Appellate Opinion at 11–14.

3
      Petitioner argues that "[t]he only evidence of what had occurred before the

4
altercation ensued was Rachal's statement 'He had a knife, he came at me.'  That

5
statement establishes a factual basis for a claim of self defense".  Pet. at 24 (citation

6
omitted).  He argues that the prosecution did not produce any evidence to contradict

7
Rachal's statement.  Traverse at 3.  Petitioner argues that "there was no evidence to

8
overcome the presumption favoring self-defense, and the jury's failure to reach such a

9
finding could only have come about from their failure to observe all the facts and

10
circumstances surrounding the case".  Pet. at 28.  Petitioner argues that there was no

11
justification for Patterson to be in his home (much less his bedroom), and that California

12
law creates a rebuttable presumption that a residential occupant has a reasonable fear of

13
death or great bodily injury when he or she uses deadly force against an unlawful and

14
forcible intruder into the residence.  Petitioner argues that Patterson initiated the attack in

15
Rachal's bedroom, where Rachal successfully defended himself.  Traverse at 3.  In short,

16
"there was no evidence to show that Patterson was lawfully on the premises, or to

17
overcome the only evidence that he started the altercation with an unprovoked attack

18
with a knife."  Id.

19
      The California Court of Appeal explained that under California law "a person may

20
use only that force which is necessary in view of the nature of the attack; any use of

21
excessive force is not justified and a homicide which results therefrom is unlawful.  A

22
person may be found guilty of unlawful homicide even where the evidence establishes

23
the right of self-defense if the jury finds that the nature of the attack did not justify the

24
resort to deadly force or that the force used exceeded that which was reasonably

25
necessary to repel the attack."  Appellate Opinion at 12 (internal citations and quotation

26
marks omitted).  It further reasoned that "[t]he question of whether defendant was entitled

27
to use deadly force was a question for the jury because at least some of the evidence

28
tended to show that the homicide was not justified and that 'the force resorted to was

24

1   excessive.'" Id. at 13.

2       The California Court of Appeal reasoned that although evidence suggested the

3   altercation began in the bedroom, evidence showing Patterson (rather than Rachal) was

4   the major source of blood in that room would supported a jury's finding that Rachal

5   initiated the use of force.  Further evidence indicated that Rachal suffered injuries to his

6   hands later, in the kitchen, where there was a mixture of defendant's blood and

7   Patterson's blood.  Additionally, Patterson's DNA was on the knife blade, and Rachal's

8   DNA was on the knife handle.  Such evidence could also have supported the jury's

9   finding.

10      Concerning Patterson's presence in Rachal's home, the California Court of Appeal

11  reasoned that "[t]here was no evidence that Patterson forced his way into defendant's

12  home." Id. at 15.  Rather, "Patterson parked and locked his car in defendant's driveway

13  in a manner suggesting he believed he was welcome at the residence.  The blood spatter

14  and DNA evidence supported a finding that defendant was the initial assailant, first

15  stabbing Patterson with a knife in the bedroom, then following him through the hallway,

16  and continuing to stab him in the kitchen until the knife broke when it hit Patterson's skull.

17  Based on these facts, the jury could have determined that the 'most reasonable

18  inferences' were that defendant either invited Patterson over as part of a plan to kill him

19  or that defendant formed the plan to kill Patterson after allowing Patterson to enter the

20  residence." Id.

21      The California Court of Appeal found that additional evidence regarding the

22  location of each party during the altercation (e.g., bloody handprints evidencing that

23  Patterson crawled out of the bedroom while Rachal walked), the persistence of Rachal's

24  use of force (e.g., Patterson's head injury and suffering over 30 stab wounds),

25  Patterson's calls for help (e.g., his bloody cellphone found on the floor and neighbors

26  hearing cries for help), and Rachal's statements following the attack that Patterson was

27  "all right" and "okay" supported a finding that a jury could reasonably conclude that

28  Rachal continued to stab Patterson at a time when Patterson was not a reasonable threat

1  to Rachal—"i.e., that even if Patterson initiated the altercation, defendant used force in

2  excess of 'that which was reasonably necessary to repel the attack.'"  Id. at 14.

3         Contrary to petitioner's arguments, the California Court of Appeal explained that

4  the jury was presented with ample evidence of what occurred before and during the

5  altercation other than Rachal's statement "He had a knife, he came at me."  See, e.g.,

6  Walters, 45 F.3d at 1358 (circumstantial evidence and inferences drawn from such

7  evidence may be sufficient to sustain a conviction); Coleman, 566 U.S. at 655 ("Jackson

8  leaves juries broad discretion in deciding what inferences to draw from the evidence

9  presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts

10  to ultimate facts.'") (quoting Jackson, 443 U.S. at 319); Begay, 673 F.3d at 1043–45

11  (evidence about defendant's activities and the manner of killing allowed inference of

12  premeditation and is sufficient "because it is 'supported by a chain of logic,' which is all

13  that is required to distinguish reasonable inference from speculation").  Although not

14  primarily in the form of witness testimony concerning the events of the attack, the

15  California Court of Appeal assessed that the jury was presented with sufficient physical

16  and other evidence to draw reasonable inferences concerning the events of the attack,

17  including who initiated it, why Patterson was inside Rachal's home, and critically whether

18  Rachal's use of force exceeded that which was reasonably necessary to repel the attack.

19  Concerning the contrary evidence that Rachel stated "He had a knife, he came at me",

20  the California Court of Appeal reasonably applying Jackson would properly grant "near-

21  total" deference to a jury's credibility determinations.  Bruce, 376 F.3d at 957.

22         Accordingly, this court finds that the California Court of Appeal's finding

23  concerning Rachal's self-defense claims was not objectively unreasonable.

24         **3.     Premeditation and Deliberation**

25         The parties agree that the prosecution was required to prove premeditation and

26  deliberation in order for the jury to convict Rachal of first degree murder.  This court

27  assesses whether California Court of Appeal's decision that "any rational trier of fact

28  could have found the essential elements of the crime beyond a reasonable doubt" was

United States District Court
Northern District of California

1    "objectively unreasonable." Parker, 567 U.S. at 43.

2          The California Court of Appeal found that there was sufficient evidence to support

3    a jury finding of premeditated and deliberate murder, stating as follows:

4          Defendant contends the evidence was insufficient to support a
      finding of premeditated and deliberate murder. His argument is
5          based on People v. Anderson (1968) 70 Cal.2d 15 (Anderson),
      in which the court set forth three categories of evidence
6          commonly present in cases of premeditated and deliberate
      murder: (1) planning activity, (2) preexisting motive and (3)
7          manner of killing.[3] (Id. at pp. 26-27.)

8          Defendant first contends there was no evidence showing that
      he planned to attack or kill Patterson. According to defendant,
9          there was no evidence that defendant "lured" Patterson to
      defendant's house or to his bedroom and no evidence that
10        defendant brought the knife to his bedroom before the violent
      altercation began. Defendant also argues that any inference of
11        premeditation was negated by the fact that Patterson was still
      alive when defendant left.

12        On this record, the jury could have reasonably concluded that
      defendant planned a knife attack on Patterson. There was no
13        evidence that Patterson forced his way into defendant's home.
      Patterson parked and locked his car in defendant's driveway in
14        a manner suggesting he believed he was welcome at the
      residence. The blood spatter and DNA evidence supported a
15        finding that defendant was the initial assailant, first stabbing
      Patterson with a knife in the bedroom, then following him
16        through the hallway, and continuing to stab him in the kitchen
      until the knife broke when it hit Patterson's skull. Based on
17        these facts, the jury could have determined that the "most
      reasonable inference[s]" were that defendant either invited
18        Patterson over as part of a plan to kill him or that defendant
      formed the plan to kill Patterson after allowing Patterson to
19        enter the residence. (See People v. Perez (1992) 2 Cal.4th
      1117, 1127.) Further, after the stabbing, defendant tried to
20        convince his neighbors that Patterson was fine, and he fled; he
      did not seem "horrified and distraught about what he had done,"
21        but rather like "someone who had just fulfilled a preconceived
      plan." (People v. Boatman (2013) 221 Cal.App.4th 1253, 1267
22        (Boatman).)

23        Defendant next contends there was no evidence of motive. He
      relies to a large extent on Boatman, supra, 221 Cal.App.4th
24        1253, in which the defendant shot his girlfriend in the face. The
25

26    _____

27    [3] The Anderson factors are not exclusive or exhaustive. "The Anderson analysis was
      intended as a framework to assist reviewing courts in assessing whether the evidence
      supports an inference that the killing resulted from preexisting reflection and weighing of
28    considerations. It did not refashion the elements of first degree murder or alter the
      substantive law of murder in any way." (People v. Thomas (1992) 2 Cal.4th 489, 517.)

United States District Court
Northern District of California

Boatman court found no evidence of motive from the victim's text messages to a friend, which suggested the defendant was angry, nor from a loud argument that began about three minutes before the shooting. (*Id.* at pp. 1258-1259, 1267-1268.) Defendant points out that according to the *Boatman* court, motive satisfies the *Anderson* test if it is "the kind of motive that 'would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed." ' [Citation.]" (*Id.* at p. 1268.)

Here, the evidence of motive was much stronger than in *Boatman*. In contrast to *Boatman*, the evidence here showed that defendant and Patterson had "long-term issues," and that they had been arguing for weeks prior to the homicide, not merely for a few minutes beforehand. Over a month before the homicide, defendant said that he "could kill" Patterson. This evidence supported an inference that the homicide " 'was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed." ' [Citation.]" (*Boatman, supra*, 221 Cal.App.4th at p. 1268.)

Last, defendant contends the "manner of killing" evidence did not support a finding that the murder was premeditated. Defendant contrasts the stabbing here with the "execution-style murder" in *People v. Hawkins* (1995) 10 Cal.4th 920, 956 (overruled on other grounds by *People v. Lasko* (2000) 23 Cal.4th 101), where the victim was shot at close range in the back of the head and neck, and with cases where the defendant stabbed the victim in the chest, where "crucial organs" are located. Defendant points out that the stab wounds suffered by Patterson were not to critical organs and that they were spread all over his body.

The evidence here strongly suggested that defendant surprised Patterson with the knife attack, indicating he premeditated the assault. Defendant's blood was not found in the bedroom, where the assault began, and the upper hand prints in the hallway were not made by someone whose hands were bleeding. By contrast, Patterson lost a significant amount of blood in the bedroom, and his hands were apparently bleeding as he crawled through the hallway. This evidence indicates that defendant suffered no defensive wounds initially, and thus indicates that he brought the knife into the bedroom and took advantage of an opportunity to attack an unsuspecting victim. In addition, most of the stab wounds were very deep—many were three inches or more, which showed that defendant acted in a manner consistent with the premeditated decision to kill Patterson. The fact that Patterson's wounds were not to vital organs does not detract from the strength of this evidence. The blood in the hallway indicated that Patterson's hands were among the first body parts injured, suggesting he put his hands up to keep defendant from stabbing more serious body parts. Further, "[t]he attack occurred in a series of rooms, indicating

1    that [Patterson's] repeated attempts to break away . . . were
2    consistently thwarted by [defendant's] relentless pursuit of him,
     even after he was gravely wounded." (*People v. Sanchez*
     (1995) 12 Cal.4th 1, 34 [manner of killing tended to
3    demonstrate the defendant acted with premeditation and
     deliberation], disapproved on another ground by *People v.*
4    *Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).) And finally,
     defendant eventually did stab Patterson in a major artery as
5    well as in the back of the head. These facts supported a finding
     that defendant "must have intentionally killed according to a
6    'preconceived design' to take his victim's life in a particular
     way." (*Anderson, supra*, 70 Cal.2d at p. 27.)

7    Because the evidence was sufficient to support a conviction of
     first degree premeditated murder, we need not consider
8    whether it also supported a conviction under a torture-murder
     theory or a lying-in-wait theory. Any deficiency in the evidence
9    of alternative first degree murder theories is harmless "absent
     an affirmative indication in the record that the verdict actually
10   did rest" on one of those theories. (*People v. Guiton* (1993) 4
     Cal.4th 1116, 1129 [where case is given to jury on different
11   factual theories, one of which is not supported by the evidence,
     court presumes the jurors rejected that theory and based the
12   verdict on the factually supported theory].) The record here
     does not affirmatively indicate the jury relied on torture or lying
13   in wait rather than premeditation as a basis for first degree
     murder.

14

15   Appellate Opinion at 14–17 (footnote in original).

16        Petitioner argues that there "was no evidence of premeditation and deliberation".

17   Pet. at 30.  He argues that there was insufficient evidence of planning, motive, and

18   manner of killing from which the trier of facts could infer premeditation and deliberation

19   pursuant to the framework outlined in People v. Anderson, 70 Cal. 2d 15 (1968).  Id. at

20   30–37.  Petitioner also argues that, as an alternative to basing the first degree murder

21   conviction on the element of premeditation and deliberation, there was insufficient

22   evidence to show the murder was conducted by torture or lying in wait, which as an

23   alternative element could support a first degree murder conviction in the absence of

24   premeditation and deliberation.  Id. at 38–45.

25        Applying petitioner's framework, the California Court of Appeal explained that

26   Anderson set forth three categories of evidence commonly present in cases of

27   premeditated and deliberate murder: (1) planning activity, (2) preexisting motive, and

28   (3) manner of killing, although the Anderson factors are not exclusive or exhaustive but

United States District Court
Northern District of California

1   are "intended as a framework to assist reviewing courts in assessing whether the

2   evidence supports an inference that the killing resulted from preexisting reflection and

3   weighing of considerations."  Appellate Opinion at 14 n.3 (quoting People v. Thomas, 2

4   Cal. 4th 489, 517 (1992)).

5            a.     **Planning**

6            Petitioner argues that there was insufficient evidence of planning because there

7   was no evidence why Patterson went to Rachal's home on the day of the altercation,

8   much less the bedroom; that the knife used in the killing of Patterson was a common

9   household item; that no evidence was presented that Rachal brought the knife to his

10  bedroom (instead, the only evidence presented at trial was that Patterson "had a knife, he

11  came at me"); and that given Patterson was one inch taller and 34 pounds heavier than

12  Rachal, "it would be totally unreasonable for Mr. Rachal to try and take down a much

13  larger man with a kitchen knife."  Pet. at 31–34.  Petitioner also argues that the fact that

14  Patterson was alive when Rachal left his home and that the killing occurred in Rachal's

15  home show that Rachel did not engage in any planning.

16           The California Court of Appeal reasoned that on the record, the jury could have

17  reasonably concluded that defendant planned a knife attack on Patterson.  It explained

18  that there was no evidence that Patterson forced his way into defendant's home, but

19  rather parked and locked his car in Rachal's driveway in a manner suggesting he

20  believed he was welcome at the residence.  Further, the blood spatter and DNA evidence

21  supported a finding that Rachal was the initial assailant, first stabbing Patterson with a

22  knife in the bedroom, then following him through the hallway, and continuing to stab him

23  in the kitchen until the knife broke when it hit Patterson's skull.  Based on these facts, the

24  jury could have reasonably inferred that defendant either invited Patterson over as part of

25  a plan to kill him or that defendant formed the plan to kill Patterson after allowing

26  Patterson to enter the residence.

27           Rachal argues that "there no evidence presented that Mr. Rachal had lured

28  Patterson to his home, let alone his master bedroom" and that "no evidence was

United States District Court
Northern District of California

United States District Court
Northern District of California

1  presented that Mr. Rachal had brought the kitchen knife to his bedroom at any time

2  before the altercation." Pet. at 33. He argues that instead, "the only evidence presented

3  at trial regarding the events immediately before the physical altercation occurred was

4  defendant's own statement, 'he had a knife, he came at me.'" Id. But Rachal's argument

5  overlooks the jury's "broad discretion in deciding what inferences to draw from the

6  evidence presented at trial" and the California Court of Appeal's role in reviewing the

7  conviction, "requiring only that jurors 'draw reasonable inferences from basic facts to

8  ultimate facts.'" Coleman, 566 U.S. at 655 (quoting Jackson, 443 U.S. at 319).

9       Accordingly, this court finds that the California Court of Appeal's finding that a

10  reasonable jury could have found that Rachal's planning supported a finding that Rachal

11  acted with premeditation and deliberation was not objectively unreasonable.

12                     **b.    Motive**

13       Petitioner argues there was no evidence that he reflected on the murder, nor that

14  he had a motive to kill Patterson from which reflection could be inferred. Pet. at 34.

15  Petitioner argues that evidence of an ongoing dispute between the two showed that he

16  and Patterson both harbored animus toward each other, and that animus was not held

17  exclusively by petitioner against Patterson, therefore not establishing a clear motive. Id.

18  The only evidence of motive was Rachal's statement that "He had a knife, he came at

19  me", which showed only a motive for self-defense. Petitioner also argues that although

20  there was evidence that Rachal had a motive to kill Patterson and even had said he

21  "could kill" him, that evidence concerned a period of time weeks before the homicide, but

22  there was no animosity at the time of the killing. Traverse at 6.

23       The California Court of Appeal explained that there was in fact strong evidence of

24  motive. The evidence at trial showed that Rachal and Patterson had "long-term issues,"

25  and that they had been arguing for weeks prior to the homicide over work and financial

26  matters. Evidence was introduced suggesting that Rachal believed that Patterson had

27  gotten him fired from a job, and Rachal wrote that Patterson had stolen $5,000 from him.

28  E.g., Appellate Opinion at 5; RT 1851–53 ("On the note itself, do you see something to

1  the effect of: '$5,000 Ricky stole my money'? A. Yes."); RT 2384 (discussing Trial

2  Ex. 100).  Further, over a month before the homicide Rachal even said that he "could kill"

3  Patterson.  This evidence could support a reasonable jury's "inference that the homicide

4  was the result of a pre-existing reflection and careful thought and weighing of

5  considerations *rather than* mere unconsidered or rash impulse hastily executed."

6  Appellate Opinion at 16 (internal quotation marks omitted) (quoting People v. Boatman,

7  221 Cal. App. 4th 1253, 1268 (2013)).

8       In arguing that the statement he "could kill" Patterson was too distant in time from

9  the killing to evidence motive, Rachal asks this court to parse the evidence and the jury's

10  interpretation of it too finely.  Likewise with Rachal's argument that he and Patterson

11  shared mutual animus rather than "a singular animus by" Rachal against Patterson.

12       Accordingly, this court finds that the California Court of Appeal's finding that a

13  reasonable jury could have found Rachal's motive to kill Patterson supported a finding

14  that Rachal acted with premeditation and deliberation was not objectively unreasonable.

15            **c.**    **Manner of Killing**

16       Petitioner argues that 34 of Patterson's 35 stab wounds were not fatal nor focused

17  on a specific vital body part.  Accordingly, the evidence supports only a verdict of murder

18  in the second degree.

19       The California Court of Appeal reasoned that the evidence strongly suggested that

20  Rachal surprised Patterson with the knife attack, indicating he premeditated the assault.

21  Rachal's blood was not found in the bedroom, where the assault began, and the upper

22  handprints in the hallway were not made by someone whose hands were bleeding.  By

23  contrast, Patterson lost a significant amount of blood in the bedroom, and his hands were

24  apparently bleeding as he crawled through the hallway.  This evidence indicates that

25  Rachal suffered no defensive wounds initially, and thus indicates that he brought the

26  knife into the bedroom and took advantage of an opportunity to attack an unsuspecting

27  victim.  In addition, most of the stab wounds were very deep—many were three inches or

28  more, which showed that defendant acted in a manner consistent with the premeditated

decision to kill Patterson.  The fact that Patterson's wounds were not to vital organs does not detract from the strength of this evidence.  The blood in the hallway indicated that Patterson's hands were among the first body parts injured, suggesting he put his hands up to keep defendant from stabbing more serious body parts.  Further, the attack continued into additional rooms, and Rachal eventually did stab Patterson in a major artery as well as in the back of the head.  Rachal's argument that none of the stabbing wounds were "centered or focused on a specific, vital body part" is belied by, at the very least, Rachal's knife attack to Patterson's head.

Accordingly, this court finds that the California Court of Appeal's finding that a reasonable jury could have found the manner of killing supported a finding that Rachal acted with premeditation and deliberation was not objectively unreasonable.

### d.    Torture and Lying in Wait

Petitioner argues that insufficient evidence was presented to support a finding that the killing was committed with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain, or murder-by-torture.

The California Court of Appeal reasoned "[b]ecause the evidence was sufficient to support a conviction of first degree premeditated murder, we need not consider whether it also supported a conviction under a torture-murder theory or a lying-in-wait theory" because there is no indication in the record that the verdict actually did rest on torture or lying in wait rather than premeditation as a basis for first degree murder.  Appellate Opinion at 17.

Because this court finds that the California Court of Appeal's reasoning concerning planning, motive, and manner of killing sufficiently supported the jury's finding of premeditation, it need not reach the question whether there was also sufficient evidence of first degree murder under the theories of torture or lying in wait.  The California Court of Appeal reasonably found that where the alleged error involves an unsupported factual theory of guilt, the jurors are presumed to have relied on the supported theory.  See also Griffin v. United States, 502 U.S. 46, 59 (1991); Taylor v. Beard, 811 F.3d 326, 334 (9th

1    Cir. 2016) (en banc).

2               e.    **Conclusion**

3          Given the California Court of Appeal's findings concerning planning, motive, and

4    manner of killing, its conclusion that a reasonable jury could have found Rachal acted

5    with premeditation and deliberation was not objectively unreasonable.

6          Claim 1 is therefore DENIED.

7    **B.   Claim 2: Whether the Trial Court Violated Rachal's Right to a Jury Trial by**

8         **Improperly Dismissing a Juror**

9          Rachal argues that the trial court violated his right to a jury trial and to due process

10   of law when it discharged juror number 11 in the absence of evidence showing

11   misconduct to a demonstrable reality.

12            1.    **Factual Background**

13         At 10:44 a.m. on August 8, 2013, the jury retired to deliberate.  The jury broke for

14   lunch at 11:52 a.m.  CT 753.  After lunch, the prosecutor told the trial court that he had

15   received a call from another Deputy District Attorney, Kevin Smith, who had overheard

16   Juror No. 11 speaking on his cellphone outside the courthouse just after noon.  RT 3559–

17   60.  The prosecutor presented Smith to explain what he had heard.  The trial court asked

18   defense counsel if he wanted Smith to be sworn in; defense counsel responded in the

19   negative, noting that Smith was an "officer of the court" who was expected to tell the

20   truth.  RT 3560.

21         Smith informed the court that around noon he was in the parking lot outside the

22   courthouse when he heard a male voice say "not guilty" while speaking to someone on a

23   cellphone.  Id.  The juror next said, "and I'll probably be the only not guilty after lunch

24   too."  Id.  The juror then walked back inside the courthouse.  Id.  Neither trial counsel nor

25   the prosecutor had any questions for Smith.

26         The court called in Juror No. 11 to explain his conduct.  Id. at 3562–63.  The juror

27   told the court that he was speaking to his sister during the lunch break about being in

28   deliberations, but he claimed he "didn't go into detail."  Id. at 3563.  When confronted with

United States District Court
Northern District of California

34

United States District Court
Northern District of California

1   the information provided by Smith that the juror was heard stating his position regarding

2   guilt, the juror denied doing so.  Juror No. 11 told the court, "I didn't say which position I

3   had.  I said . . . I haven't decided yet."  Id. at 3564.  The court asked, "So, are you saying

4   that you did not discuss your position with respect to whether or not you felt the

5   defendant was guilty or not guilty in this case?"  Id.  Juror No. 11 responded

6   unequivocally, "No, I did not."  Id.  The juror also told that court that he did not discuss the

7   position of the other jurors.  Juror No. 11 stated that he told his sister "We are in

8   deliberation . . . through this day, possibly tomorrow."  Id.

9        The court discussed the matter with the attorneys at the bench and then told Juror

10   No. 11 that both counsel wanted the court's inquiry to be more "precise" and to advise the

11   juror that a deputy district attorney overheard him use the words "not guilty."  Id. at 3565.

12   At that point, Juror No. 11 admitted that in fact he used those words.  Id. at 3565–66.

13   When pressed by the court, Juror No. 11 stated, "I said: 'We are in jury deliberation

14   now. . . .  We've got to prove if he's guilty or not guilty, and it's going to take some time,

15   and everybody has got a chance to say what they believe, and it will be . . . a period of

16   deliberation."  Id. at 3566.  The court again asked if the juror said anything about being

17   "the only not guilty vote after lunch" and again the juror denied making such a statement

18   but stated that he told his sister "that we've got to decide if he's guilty or not guilty, and

19   that, you know, we will be back into deliberation after lunch."  Id.  The court excused the

20   juror from the courtroom and again asked Deputy District Attorney Smith whether he had

21   any doubt about what he overheard the juror say on the cell phone.  Id. at 3567.  Smith

22   stated that he had no question about what he overheard, "I heard him say 'not guilty' with

23   no explanation after it.  And then I heard, 'And after lunch, I'll probably be the only not

24   guilty too.'"  Id. at 3568.

25        Thereafter, the prosecutor argued that the juror should be discharged for violating

26   the court's instructions not to talk about the case with anyone outside the courtroom and

27   to discuss the case only in the jury room when all other jurors are present.  Id. at 3569–

28   71.  The prosecutor argued that Smith was credible and Juror No. 11 was not.  Id. at

1   3571–72.  Defense counsel argued that Juror No. 11 had not discussed the details of the

2   case and therefore had not violated the admonition.  Id. at 3572–74.

3         The trial court determined that the juror should be discharged, stating as follows:

4         We are all concerned with the integrity of the jury process, and
          I know that. There are two issues here.

5

6         There is the issue regarding misconduct and credibility. With
          respect to misconduct, I, once again, looked at the language of
          CAL-CRIM 3550. Mr. Boyd [the prosecutor] read it. It does
7         clearly say: "Do not talk about the case or about any of the
          people or any subject involved in it with anyone." And it goes
8         on to say: "Do not discuss your deliberations with anyone."

9         It is clear that in this case Mr.—rather Juror Number 11 did
          discuss the case with his sister. When we come to the issue of
10        credibility, I have a veteran district attorney. And what makes it
          really simple for me is that Kevin Smith has tried – I can name
11        three major cases offhand; one that lasted for weeks. That I
          suspect that there were more than that. There could have been
12        as many as four or five over the years, spanning many years.
          And I have such respect for him, not only his skills as an
13        attorney, but he's one of the handful of attorneys that whatever
          he says, you can take it to the bank. He has integrity. He has
14        intelligence. He's a district attorney who does the right thing.
          Even in a sentencing last week, he did the right thing by giving
15        a defendant a break after he had been convicted in a jury trial.
          He is the quintessential prosecutor who does believe that he
16        has the ethical obligation to accomplish justice. . . . So if Mr.
          Smith said he heard it, I know he heard it.

17

18        And Mr. Boyd's observations regarding Juror Number 11 were
          very accurate. He was clearly uncomfortable. Now, well, you
19        can certainly say that that is because here he is called into a
          courtroom. It appears that it's an inquisition. Then when I did
20        try to put him at ease, but he was evasive. I questioned him two
          times, and I think it's clear that the first set of answers were
21        different from the second set of answers. So, he was evasive,
          he was nervous, he was clearly not candid. The court finds that
22        he was not credible.

23        The court is satisfied that Mr. Smith is very credible, and the
          court finds that there is a demonstrable reality that Juror
24        Number 11 cannot has not [sic] abided by the court's
          instructions and cannot continue to abide or will not continue to
25        abide by the court's instructions. Accordingly, the court finds
          good cause to discharge Juror Number 11.

26   Id. at 3575–76.

27         On review, the California Court of Appeal found no constitutional error.  Under

28   California law, the basis of the juror's disqualification must appear on the record as a

36

"demonstrable reality."  The appellate court held:

> Substantial evidence supports the trial court's finding that Smith was credible. (See *Linton, supra*, 56 Cal.4th at p. 1194.) As defendant's trial counsel observed, Smith was an officer of the court who was expected to tell the truth. Smith was definitive and consistent when reporting on the conversation he had overheard, and he told the trial court there was no question in his mind about what he had heard. The trial court heard Smith's account of what he heard and thus was able to see Smith's demeanor first-hand.

> Substantial evidence also supports the trial court's finding that Juror No. 11 was not credible. Juror No. 11 was vague and inconsistent when reporting on his statements to his sister. Juror No. 11 first told the trial court only that he had told his sister about "being in the jury deliberation." Upon prodding from the trial court, Juror No. 11 then added that he had also told his sister that he had not decided yet. Upon still further questioning, he admitted using the term "not guilty," but he denied stating a position. The trial court was able to observe Juror No. 11's demeanor in making these statements. With respect to defendant's claim that that the jurors were unlikely to have taken a vote at the beginning of deliberations, we observe that it is common for a jury to take a preliminary vote soon after they have retired to deliberate. (See, e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 194; *Vomaska v. City of San Diego* (1997) 55 Cal.App.4th 905, 909.)

> On this record, the trial court could reasonably conclude that Juror No. 11 was less credible than Smith, and that Juror No. 11 had in fact violated his duty not to discuss the case or the deliberations with anyone. As the basis for Juror No. 11's disqualification appears on the record "as a 'demonstrable reality,'" the trial court did not abuse its discretion by dismissing that juror. (*Lomax, supra*, 49 Cal.4th at p. 589.)

Appellate Opinion 22–23.

### 2.   Legal Standard

The Sixth Amendment affords criminal defendants the right to trial by an impartial jury.  The right to a jury trial applies to state criminal trials through the Due Process Clause of the Fourteenth Amendment.  See Duncan v. Louisiana, 391 U.S. 145, 149 (1968).  The Sixth Amendment and the Due Process Clause "entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. 466, 477 (2000) (internal quotation marks omitted).  A particular juror substitution may be

37

challenged on grounds there was not good cause for it.  See Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997), cert. denied, 522 U.S. 1096 (1998).

The parties dispute the appropriate standard of review for a dismissal for good cause.  Petitioner argues that a federal court reviewing a habeas petition assesses whether "a juror's inability to perform as a juror [was] shown as a demonstrable reality, which requires a stronger evidentiary showing than mere substantial evidence".  Pet. at 46 (internal quotation marks and citations omitted).  The "demonstrable reality" standard requires a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion that bias was established.  He argues that the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.  Id.

Respondent argues that the determination of whether a juror was removed for good cause due to bias is a question of fact, and a state court's factual finding is presumed correct under 28 U.S.C. § 2254(e)(1) unless the petitioner rebuts the finding by clear and convincing evidence.  Answer at 20 (citing Hedlund v. Ryan, 815 F.3d 1233, 1248 (9th Cir. 2016)).

Petitioner relies primarily on People v. Wilson, 44 Cal. 4th 758 (2008), which did not concern a habeas claim but rather was a direct appeal of the defendant's conviction. Although the appellant presented arguments concerning "his right to a fair and impartial jury, as well as a unanimous jury, under the Sixth and Fourteenth Amendments to the United States Constitution . . . . [h]e also contend[ed] the court's action violated his rights under [Cal. Penal Code] section 1089."  Wilson, 44 Cal. 4th at 814.  Prior to analyzing the petitioner's arguments concerning the discharge of a juror, that court specifically clarified that its "conclusion, based on state law, obviates the need to decide whether removal of Juror No. 5 also violated defendant's constitutional rights."  Id.  Petitioner's reliance on California law in support of his argument that this court must, on reviewing his habeas petition, probe the trial court's reasoning to ensure its conclusions were manifestly supported by evidence on which it actually relied is not persuasive.  Accordingly, this

1   court assesses whether petitioner has rebutted the sate court's finding that the juror was

2   removed for good cause by clear and convincing evidence.

3       **3.   Alleged State Law Violations**

4       California's statute for discharge and substitution of jurors has been upheld as

5   facially constitutional.  See Miller, 757 F.2d at 995.  The statute reads, in relevant part:

6           If at any time, whether before or after the final submission of
            the case to the jury, a juror dies or becomes ill, or **upon other**
7           **good cause shown to the court is found to be unable to**
            **perform his or her duty**, or if a juror requests a discharge and
8           good cause appears therefor, the court may order the juror to
            be discharged and draw the name of an alternate, who shall
9           then take a place in the jury box, and be subject to the same
            rules and regulations as though the alternate juror had been
10          selected as one of the original jurors.

11  Cal. Penal Code § 1089 (emphasis added).

12      Petitioner's claim, to the extent that it is rooted in an argument that the trial court

13  violated state law in removing Juror No. 11, fails.  See Estelle v. McGuire, 502 U.S. 62,

14  67–68 (1991) (a federal writ is not available for alleged error in the interpretation or

15  application of state law); Swarthout v. Cooke, 562 U.S. 216, 221 (2011) (per curiam) (no

16  federal habeas challenge cognizable to challenge whether state law was correctly

17  applied).  "[The Supreme Court has] long recognized that a mere error of state law is not

18  a denial of due process" (Swarthout, 562 U.S. at 863 (internal quotation marks omitted)),

19  and a petitioner may not transform a state-law issue into a federal one by simply

20  asserting a violation of due process (Langford v. Day, 110 F.3d 1380, 1389 (9th Cir.

21  1996)).

22      Moreover, "a state court's interpretation of state law, including one announced on

23  direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."

24  Bradshaw v. Richey, 546 U.S. 74, 76 (2005); see West v. AT & T, 311 U.S. 223, 236

25  (1940) ("the highest court of the state is the final arbiter of what is state law.  When it has

26  spoken, its pronouncement is to be accepted by federal courts as defining state law");

27  Hicks v. Feiock, 485 U.S. 624, 629–30 & n.3 (1988) (a determination of state law by a

28  state intermediate appellate court is also binding in a federal habeas action).  This is

United States District Court
Northern District of California

especially true where the highest court in the state has denied review of the lower court's decision.  Hicks, 485 U.S. at 629–30 & n.3; see West, 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court."); Shannon v. Newland, 410 F.3d 1083, 1087 (9th Cir. 2005) (same).

Here, petitioner appealed his conviction within California's courts, none of which found that the trial court's action violated his rights under Cal. Penal Code section 1089. That conclusion remains binding on this court.

### 4.    Alleged Constitutional Violations

The court next considers whether the California Court of Appeal's decision is contrary to or an unreasonable application of clearly established federal law.  See 28 U.S.C. § 2254(d).

"Under Supreme Court precedent, the remedy for allegations of juror misconduct is a prompt hearing in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not the misconduct was prejudicial."  Bell v. Uribe, 748 F.3d 857, 867 (9th Cir. 2014), cert. denied sub nom. DeMola v. Johnson, 135 S. Ct. 1545 (2015) (decision of state appellate court that trial judge properly removed a juror after she consulted a dictionary during deliberations in violation of the court's express instructions was not contrary to or an unreasonable application of clearly established federal law).  "[O]n habeas review, a trial court's findings regarding juror fitness are entitled to special deference.  Accordingly, we review for manifest error the trial court's determination that" a juror cannot render an impartial verdict.  Perez, 119 F.3d at 1426 (citation omitted) (citing Patton v. Yount, 467 U.S. 1025, 1036–38 & n.12 (1984) (whether a juror can render an impartial verdict is a question of historical fact entitled to special deference)).

Excusal of a juror may be permissible even where the trial court knows the excused juror was the sole holdout for acquittal.  See id. at 1427 (dismissal of holdout

40

1    juror permissible because juror's emotional instability that made her unable to continue

2    deliberating provided good cause for her dismissal).  The court may not, however,

3    remove a juror during deliberations if the request for discharge stems from doubts about

4    the sufficiency of the government's evidence.  See id. at 1428; accord United States v.

5    Litwin, 972 F.3d 1155, 1169, 1171, 1174–75 (9th Cir. 2020) (dismissal inappropriate

6    where juror's obstructive behavior may have stemmed from her views on the merits of the

7    case).

8         Petitioner argues that "the only evidence in the record is Juror No. 11's continued

9    position that he did not violate the admonition given to him by the court, and that he could

10   continue on with the instructions given to him" to proceed as a fair juror.  Pet. at 48.  Later

11   recognizing contradictory evidence in the form of the deputy district attorney's testimony,

12   petitioner argues that the trial court should have discounted that evidence, weighed Juror

13   No. 11's testimony more highly, and "presume[d] that the jury will follow the instructions

14   given to them by the court."  Id.  Petitioner argues that the trial court would only have

15   been permitted to dismiss Juror No. 11 if that juror had himself indicated that he could not

16   abide by the court's instructions:  "Thus, without any indication given by Juror No. 11 that

17   [he] could not abide by the instructions, the court was required to keep him on the jury

18   panel."  Id.; Traverse at 9.  Petitioner also argues that evidence of past rule-breaking

19   would not justify dismissal because such evidence was not relevant to whether the juror

20   could follow rules in the future, and that the trial judge made an incorrect and

21   impermissible credibility determination when weighing Juror No. 11's testimony against

22   the deputy district attorney's.  Pet. at 48–49.  Not only does petitioner disagree with the

23   trial court's credibility determination, but he in fact disputes the court's ability to make a

24   credibility determination at all by considering testimony concerning Juror 11's alleged

25   misconduct.  Traverse at 9 ("The decision was clearly based on the personal opinion of

26   the judge, i.e. the weight of the credibility put on Kevin Smith versus Juror No. 11"

27   because "[t]o compare the two is incredibly biased and unfair").  Finally, petitioner also

28   argues that it was factually unlikely that Juror No. 11 would have known he was the only

41

1    not-guilty vote because deliberations had only just begun at the time of the call, and if he

2    did know that removal was prejudicial because the court removed the only not-guilty vote.

3         Respondent argues that the determination whether a juror is impartial is a question

4    of fact, and particular deference is owed when the determination relies on credibility

5    determinations.  Answer at 20.  The trial court's determinations were amply supported by

6    the record.

7         Here, the trial court had instructed all jurors that they may "not talk about the case

8    or about any of the people or any subject involved in it with anyone, including, but not

9    limited to, your spouse or other family, or friends, spiritual leaders or advisors, or

10   therapists.  You must discuss the case only in the jury room and only when all jurors are

11   present.  Do not discuss your deliberations with anyone."  RT at 3550; see also

12   CALCRIM No. 3550; Cal. Penal Code § 1122(a)(1) & (b) (jurors must be instructed after

13   being sworn, and at each adjournment of the court, that they "shall not converse among

14   themselves, or with anyone else, . . . on any subject connected with the trial").  The trial

15   court was presented with evidence that Juror No. 11 violated this instruction.  See, e.g.,

16   RT 3560.

17        When asked, Juror No. 11 initially denied discussing the case with his sister on the

18   telephone in "detail" and denied saying "which position" he had concerning petitioner's

19   guilt or innocence.  Id. at 3564.  Only when told by the court that he was heard saying the

20   words "not guilty", he admitted to using those words and divulged additional information

21   concerning his conversation with his sister, including that the jury was in deliberation now

22   and that deliberations would "take some time" and that "it's going to take some time, and

23   everybody has got a chance to say what they believe".  Id. at 3562–66.  The court heard

24   testimony from a witness who overheard portions of the conversation, which included

25   Juror No. 11's statement that "after lunch, I'll probably be the only not guilty too."  Id. at

26   3568.

27        Following the prompt hearing concerning what transpired, the trial court found that

28   "[i]t is clear that . . . Juror Number 11 did discuss the case with his sister."  Id. at 3575–76.

United States District Court
Northern District of California

42

1   Concerning the content of that conversation, the judge made a reasoned credibility

2   determination among the witnesses who presented information at that hearing.  The court

3   explained the credibility of each witness, including Juror No. 11's discomfort,

4   evasiveness, and in particular that after two episodes of questioning it was "clear that the

5   first set of answers were different from the second set of answers.  So, he was evasive,

6   he was nervous, he was clearly not candid.  The court finds that he was not credible."  Id.

7   at 3575–76.  The court reasoned that "there is a demonstrable reality that Juror

8   Number 11 cannot has not [sic] abided by the court's instructions and cannot continue to

9   abide or will not continue to abide by the court's instructions."  Id. at 3576.

10          The California Court of Appeal found that the basis for Juror No. 11's

11   disqualification appears on the record as a demonstrable reality, and the California

12   Supreme Court did not disagree.  Appellate Opinion at 22–23 ("As the basis for Juror

13   No. 11's disqualification appears on the record as a demonstrable reality, the trial court

14   did not abuse its discretion by dismissing that juror.") (internal quotation marks omitted);

15   Pet., Ex. U (denying petition for review).

16          Although this court inquires only whether the California Court of Appeal's decision

17   is contrary to or an unreasonable application of clearly established federal law, it is clear

18   based on the record that the trial court's decision would also satisfy the higher

19   "demonstrable reality" standard of review.  The trial court made a reasoned decision

20   following a prompt hearing concerning the juror's alleged misconduct, at which the juror

21   admitted to violating his admonitions by discussing deliberations with his sister—contrary

22   to petitioner's argument that he did not in fact violate any admonition.  Moreover, the

23   decision to dismiss the juror was fundamentally based on a credibility determination

24   concerning Juror No. 11's truthfulness and ability to follow the court's instructions.

25   Contrary to petitioner's argument, the trial court was not required to hear testimony

26   exclusively from Juror No. 11, nor was it precluded from making credibility determinations

27   when hearing testimony at the hearing.  And although petitioner argues that the trial court

28   made incorrect credibility assessments, such determinations are afforded particular

1   deference on habeas review.  Nor does the fact that Juror No. 11 claimed to be the only

2   not-guilty vote render the excusal impermissible.  See Perez, 119 F.3d at 1427.

3       Following a reasoned explanation, the court found that Juror Number 11 did not

4   and could not abide by the court's instructions.  That factual determination was a

5   reasonable exercise of the trial court's discretion, and accordingly the California Court of

6   Appeal's decision denying this claim is not contrary to or an unreasonable application of

7   United States Supreme Court authority and may not be set aside.  See 28 U.S.C.

8   § 2254(d)(1).

9       Claim 2 is therefore DENIED.

10  **C.      Claim 3:  Whether the Trial Court Erred by Failing to Instruct the Jury on a**

11  **         Lesser Included Offense**

12      Petitioner argues that the trial court's refusal to instruct on the lesser included

13  offense of voluntary manslaughter violated his right to due process.  He argues that the

14  court should have instructed on both heat of passion and unreasonable self-defense,

15  which can result in a voluntary manslaughter verdict if accepted by the jury.   Respondent

16  argues that the claim is (1) not cognizable; (2) procedurally defaulted under the "invited

17  error" doctrine; and (3) meritless.

18      "Under the law of this circuit, the failure of a state trial court to instruct on lesser

19  included offenses in a non-capital case does not present a federal constitutional

20  question."  Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); Solis v. Garcia, 219

21  F.3d 922, 929 (9th Cir. 2000) ("we adhere to the law as stated in Bashor and its

22  predecessors" that "the failure of a state court to instruct on a lesser offense [in a non-

23  capital case] fails to present a federal constitutional question and will not be considered in

24  a federal habeas corpus proceeding"); see also Keeble v. United States, 412 U.S. 205,

25  213 (1973) ("we have never explicitly held that the Due Process Clause of the Fifth

26  Amendment guarantees the right of a defendant to have the jury instructed on a lesser

27  included offense"); United States v. Rivera-Alonzo, 584 F.3d 829, 834 n.3 (9th Cir. 2009)

28  ("In the context of a habeas corpus review of a state court conviction, we have stated that

United States District Court
Northern District of California

1   there is no clearly established federal constitutional right to lesser included instructions in

2   non-capital cases."); cf. Vickers v. Ricketts, 798 F.2d 369, 371 (9th Cir. 1986) (due

3   process requires that court give instruction sua sponte in capital cases), cert. denied, 479

4   U.S. 1054 (1987); Beck v. Alabama, 447 U.S. 625, 638 (1980) (same).

5        In the absence of clearly established Supreme Court law, the state court's ruling

6   cannot be unreasonable.  Harrington, 562 U.S. at 101 ("It is not an unreasonable

7   application of clearly established Federal law for a state court to decline to apply a

8   specific legal rule that has not been squarely established by this Court.") (quoting

9   Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)).  Accordingly, habeas relief is

10   unavailable for this claim.  Claim 3 is DENIED.

**D.    Claim 4:  Whether the Trial Court Erred by Failing to Properly Instruct the Jury on the Issue of Self-Defense**

13        In Claim 4, petitioner contends the trial court committed prejudicial error by

14   incorrectly instructing the jury on self-defense in the home.  Respondent argues that the

15   error was not prejudicial.

16        **1.    Factual Background**

17   The trial court instructed the jury:

> The defendant is not guilty of murder if he killed to defend
> himself in the defendant's home.  Such a killing is justified, and
> therefore not unlawful, if:  One, the defendant reasonably
> believed that he was defending his home against Ricky
> Patterson who intended to or tried to commit the crime of
> assault with a deadly weapon **and** tried to enter or did enter
> that home intending to commit an act of violence against
> someone inside.

23   RT 3392–93 (emphasis added); CT 760.  The court should have instructed the jury with

24   the word "or" instead of "and."  See CALCRIM No. 506; Cal. Penal Code § 197.

25        The California Court of Appeal reviewed this argument, found that the trial court

26   erred, and determined that the error was not prejudicial:

> We will assume that a court's misinstruction on an element of
> a defense is akin to a court's misinstruction on an element of
> an offense, which is subject to harmless error review under the

United States District Court
Northern District of California

beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (See *People v. Flood* (1998) 18 Cal.4th 470, 502-503.) Under this standard, the error is harmless only if we can declare "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman, supra*, at p. 24.) "To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403 (*Yates*) disapproved on another ground by *Estelle v. McGuire* (1991) 502 U.S. 62, 73, fn. 4.)

As given, the instruction required the jury to find that Patterson both (1) "intended to or tried to commit the crime of assault with a deadly weapon" and (2) "tried to enter or did enter that home intending to commit an act of violence against someone inside." The instruction should have required the jury to find only one of these two facts. On this record, however, the error was harmless beyond a reasonable doubt. The defense theory was that Patterson went to defendant's residence with the intent to commit an act of violence against him, and then proceeded to assault defendant with the knife while defendant was in his bed. Defendant's trial counsel never argued that Patterson formed the intent to commit an act of violence against defendant after entering the residence. If the jury believed the defense theory that Patterson assaulted defendant with a knife while defendant was in bed, it would have found that Patterson both "intended to or tried to commit the crime of assault with a deadly weapon" *and* "tried to enter or did enter that home intending to commit an act of violence against someone inside." Because the defense theory relied on the existence of both facts, the instructional error was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates, supra*, 500 U.S. at p. 403.)

Moreover, the defense of section 197, subdivision (2) as defined in CALCRIM No. 506 required the jury to find that defendant "used no more force than was reasonably necessary to defend against the danger." The evidence overwhelmingly established that defendant used more force than necessary, even if Patterson did initiate the assault by coming towards defendant with a knife. The incident began in the bedroom, where only Patterson's blood was found. This evidence established that defendant either initiated the assault with the knife or quickly disarmed Patterson of the knife. Further, Patterson was stabbed more than 30 times, including a likely final blow to the back of the head that was hard enough to break the knife. Many of Patterson's wounds were inflicted in the kitchen, after he was so wounded he could only crawl out of the bedroom. On this record, no reasonable juror would find that defendant "used no more force than was reasonably necessary to defend against the danger." Thus, beyond a reasonable doubt, the instructional error with respect to Patterson's intent and entry "did not contribute to the verdict obtained." (*Chapman, supra*, 386 U.S. at p. 24.)

Appellate Opinion at 28–29.

### 2.    Legal Standard

The parties agree that the California Court of Appeal already found error.  They dispute whether that error was prejudicial.  Petitioner argues that reversal is required under the Chapman "harmless beyond a reasonable doubt" standard, because the burden is on the state to show "beyond a reasonable doubt" that the error had no effect on the verdict.  Chapman v. California, 386 U.S. 18 (1967).  Respondent argues that petitioner's claims must be denied if the federal habeas court finds either that the state court's Chapman holding was reasonable or that the error was harmless under Brecht.

"When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in Brecht and the one Congress prescribed in AEDPA."  Brown v. Davenport, 596 U.S. 118, 122 (2022).  "[S]atisfying Brecht is only a necessary, not a sufficient, condition to relief. AEDPA too must be satisfied."  Id. at 127.  "[A] state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA."  Id.  Accordingly, this court must deny relief if the California Court of Appeal's "conclusions involved neither an unreasonable application of Chapman nor an unreasonable determination of the facts." Id. at 125 & 134 ("a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents or AEDPA.  But to *grant* relief, a court must find that the petitioner has cleared both tests.").

The AEDPA test "requires a habeas petitioner to prove that the state court's decision [applying Chapman] was unreasonable."  Id. at 135.  "To accomplish that, a petitioner must persuade a federal court that no fairminded jurist could reach the state court's conclusion under [the Supreme] Court's precedents."  Id. (internal quotation marks omitted).  Chapman held that a claim "of constitutional error identified on direct appeal does not require reversal of a conviction if the prosecution can establish that the error was harmless beyond a reasonable doubt."  Id. at 124.

Under the Brecht test, a habeas petitioner is not entitled to relief unless the

47

instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. at 637; see, e.g., Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir. 2000) (finding Brecht error where "at the very least, we 'cannot say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'").  The proper question in assessing harm under Brecht is, "Do I, the judge, think that the error substantially influenced the jury's decision?" O'Neal v. McAninch, 513 U.S. 432, 436 (1995).  If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.  Id. at 437.  If, on the other hand, the court is not fairly assured that there was no effect on the verdict, it must reverse.  Id.  In the "narrow circumstance" in which the court is in "grave doubt" about whether the error had substantial and injurious effect or influence in determining the jury's verdict, it must assume that the error is not harmless and the petitioner must win.  Id. at 436–44 (relief granted because record so evenly balanced that conscientious judge in grave doubt as to harmlessness of error); Chambers v. McDaniel, 549 F.3d 1191, 1200–01 (9th Cir. 2008) (granting habeas relief based upon "grave doubt" as to harmlessness of erroneous first degree murder instruction on premeditation, where error went to "very heart of the case" and evidence against petitioner was not so great that it precluded a verdict of second degree murder); Murtishaw v. Woodford, 255 F.3d 926, 974 (9th Cir. 2001) (granting habeas relief as to death sentence where Ninth Circuit in "grave doubt" about whether the jury would have returned a death sentence even if they had been properly instructed that they did not have to do so after weighing mitigating and aggravating circumstances).

"In sum, where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, Brecht asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict."  Davenport, 596 U.S. at 136.

### 3. Analysis

This court first inquires whether the state court's decision applying <u>Chapman</u> was unreasonable.

In order to show a justified killing, the court's erroneous instruction required Rachal to prove both that he reasonably believed that he was defending his home against Patterson who intended to or tried to assault him with a deadly weapon; **and** that Patterson tried to enter or did enter Rachal's home intending to commit an act of violence. The instruction should have required Rachal to prove only one of those elements. Petitioner argues that the evidence supported a finding that Patterson entered the premises and committed an act of violence (the first element), but that it was impossible to show his intent at the moment of entry (the second element). Pet. at 68; Traverse at 17.

The California Court of Appeal properly identified the controlling standard in <u>Chapman</u>. <u>See</u> Appellate Opinion at 28–29. It also identified the nature of the error in the instruction. <u>Id.</u> The appellate court concluded that the prosecution had established the erroneous jury instruction was harmless beyond a reasonable doubt in light of the defense's theory that Patterson went to Rachal's residence with the intent to commit an act of violence against him, and then proceeded to assault defendant with the knife while defendant was in his bedroom. Defendant's trial counsel didn't rely on an argument consistent with a theory that Patterson formed the intent to commit an act of violence against defendant only after entering the residence. Therefore:

> If the jury believed the defense theory that Patterson assaulted defendant with a knife while defendant was in bed, it would have found that Patterson both "intended to or tried to commit the crime of assault with a deadly weapon" *and* "tried to enter or did enter that home intending to commit an act of violence against someone inside." Because the defense theory relied on the existence of both facts, the instructional error was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates, supra*, 500 U.S. at p. 403.)

Appellate Opinion at 29.

Even had the instructional error harmed Rachal contrary to the California Court of Appeal's explanation above, that court reasoned further that in order to find defendant not guilty of murder due to justified killing the jury must also have found that defendant "used no more force than was reasonably necessary to defend against the danger" pursuant to the defense of section 197, subdivision (2) as defined in CALCRIM No. 506.  Id.  The court reasoned that "[t]he evidence overwhelmingly established that defendant used more force than necessary, even if Patterson did initiate the assault by coming towards defendant with a knife." Id.  The court recounted trial evidence discussed above, including that Patterson was stabbed more than 30 times, that Patterson was stabbed in the back of the head hard enough to break the knife, and that many of Patterson's wounds were inflicted in the kitchen after he was so wounded he could only crawl out of the bedroom.  The court reasoned that "[o]n this record, no reasonable juror would find that defendant 'used no more force than was reasonably necessary to defend against the danger.'  Thus, beyond a reasonable doubt, the instructional error with respect to Patterson's intent and entry 'did not contribute to the verdict obtained.'"  Id. (quoting Chapman, 386 U.S. 18).

This court finds that the California Court of Appeal's conclusion that the error was harmless beyond a reasonable doubt was not so lacking in justification that it was beyond any possibility for fairminded disagreement.  Here, "[e]ven if some fairminded jurist applying Chapman could reach a different conclusion, we cannot say that every fairminded jurist must."  Davenport, 596 U.S. at 144.

Accordingly, Claim 4 is DENIED, and the court need not additionally assess the claim under the standard set out in Brecht.  See id. at 134 ("a federal court must deny relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents or AEDPA.  But to grant relief, a court must find that the petitioner has cleared both tests.").

**E.    Claim 5:  Prosecutorial Misconduct**

In Claim 5, petitioner argues that the prosecutor's actions so infected the trial with

1   unfairness as to make the resulting conviction a denial of due process.  Pet. at 69.

2   Petitioner contends the prosecutor committed misconduct by (1) misstating the law,

3   (2) appealing to the sympathies of the jurors, (3) injecting his personal opinion of the

4   evidence into the trial, and (4) attacking defense counsel.[4]  Traverse at 18.

5        As a threshold matter, respondent argues that petitioner's arguments regarding

6   the alleged misconduct in Claim 5 are procedurally defaulted because trial counsel failed

7   to object to any of the alleged instances of prosecutorial misconduct at trial.  Answer at

8   32.  Respondent argues that this court cannot reach the merits of a claim where the state

9   court has resolved the issue based on a state procedural ground that is independent and

10  adequate to support the judgment, and that the Ninth Circuit has held that failure to

11  comply with California's contemporaneous objection requirement constitutes a procedural

12  default.  As failure to comply with California's contemporaneous objection requirement

13  constitutes a procedural default, respondent argues that this court must dismiss the

14  prosecutorial misconduct claims with prejudice, unless petitioner meets his burden to

15  show ineffective assistance of counsel or cause and prejudice.  Petitioner argues that "a

16  failure to object or request an admonition does not forfeit the issue", and that even if it

17  normally would the issue is not forfeit because he "can meet his burden to show cause

18  and prejudice" based on his argument that "the failure of Petitioner's counsel to object

19  amounted to ineffective assistance of counsel in violation of the Sixth Amendment."

20  Traverse at 20; see also Pet. at 68–72.

21        This court cannot reach the merits of a claim where the state court has resolved

22  the issue based on a state procedural ground that is independent and adequate to

23  support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729, holding modified by

24  Martinez v. Ryan, 566 U.S. 1 (2012).  Failure to comply with California's

25  contemporaneous objection requirement constitutes a valid procedural default.  Zapata v.

26

27  _____

28  [4] Petitioner also contends as part of Claim 6 that trial counsel was ineffective for failing to object to these alleged instances of prosecutorial misconduct.  Traverse at 20.  Those arguments are addressed with petitioner's ineffective assistance of counsel claims below.

United States District Court
Northern District of California

1   Vasquez, 788 F.3d 1106, 1112 (9th Cir. 2015) (failure to object to prosecutorial

2   misconduct); Rich v. Calderon, 187 F.3d 1064, 1070 (9th Cir. 1999) (same);

3   Featherstone v. Estelle, 948 F.2d 1497, 1506 (9th Cir. 1991) (same).

4          Under California law, claims of prosecutorial misconduct must be objected to at

5   trial in order to be preserved on appeal.  See People v. Fosselman, 33 Cal. 3d 572, 580–

6   81 (1983).  A petitioner who fails to observe a state's "contemporaneous objection" rules

7   may not challenge the constitutionality of the conviction in federal court absent a showing

8   of cause and prejudice.  See Engle v. Isaac, 456 U.S. 107, 129 (1982); United States v.

9   Frady, 456 U.S. 152, 162-169 (1982) (while plain error applies in determining whether a

10  defendant may raise a claim for the first time on direct appeal, cause and prejudice

11  standard applies in determining whether that same claim may be raised on habeas);

12  Fauber v. Davis, 43 F.4th 987, 1001-1002 (9th Cir. 2002) (petitioner failed to show cause

13  and prejudice for his defaulted prosecutorial misconduct claim based on improper

14  vouching through the admission of witness's plea agreement); see also Sawyer v.

15  Whitley, 505 U.S. 333, 339-40 (1992); Kuhlmann v. Wilson, 477 U.S. 436, 454–55 (1986)

16  (If a state prisoner cannot meet the cause and prejudice standard, however, a federal

17  court may hear the merits of successive, abusive or procedurally defaulted claims if the

18  failure to hear the claims would constitute a "miscarriage of justice.").  Petitioner relies

19  exclusively on United States v. Sanchez, 176 F.3d 1214, 1218 (9th Cir. 1999) for his

20  position that this court may review his claim of prosecutorial misconduct "for plain error"

21  absent his contemporaneous objection, but that case is inapposite as it concerned a

22  direct appeal of a criminal conviction in federal district court, not a habeas claim.

23         Accordingly, petitioner may not challenge the constitutionality of his conviction in

24  this court on this basis absent a showing of cause and prejudice.  Thus, this court must

25  dismiss Claim 5 unless petitioner meets his burden to show cause and prejudice.  See

26  Thompson, 501 U.S. at 750.

27         Petitioner alternatively argues that this claim is preserved under the "cause and

28  prejudice" standard due to his trial counsel's ineffective assistance.  The cause standard

1   requires the petitioner to show that "'some objective factor external to the defense

2   impeded counsel's efforts' to construct or raise the claim." McClesky v. Zant, 499 U.S.

3   467, 493 (1991) (citing Murray v. Carrier, 477 U.S. at 488).  A petitioner may show cause

4   by establishing constitutionally ineffective assistance of counsel, but attorney error short

5   of constitutionally ineffective assistance of counsel does not constitute cause and will not

6   excuse a procedural default.  See McCleskey, 499 U.S. at 494; Carrier, 477 U.S. at 486-

7   88; see, e.g., Fauber, 43 F.4th at 1003 (petitioner cannot meet the "cause and prejudice"

8   standard by relying on counsel's alleged ineffective assistance which does not rise to the

9   level of a Sixth Amendment violation because he cannot show prejudice).

10          Because petitioner's "cause and prejudice" arguments rely on claims that his trial

11   counsel was constitutionally ineffective, those arguments are addressed together with

12   petitioner's other ineffective assistance of counsel claims below.  For the reasons

13   discussed below, petitioner fails to show cause and prejudice, and Claim 5 is therefore

14   DENIED.

15   **F.      Claim 7:  Whether the Trial Court Improperly Admitted Evidence Regarding**

16           **Petitioner's Ex-girlfriend**

17          Petitioner argues that the trial court committed prejudicial error in violation of his

18   right to due process by admitting evidence regarding his relationship with his ex-girlfriend,

19   Chanda McClendon.  Pet. at 81–82.  Respondent argues that (1) the claim was not

20   exhausted in state court and therefore cannot be granted by this court; and (2) on the

21   merits, no due process violation occurred.

22          **1.      Factual Background**

23          At trial, the prosecution called as a witness Chanda McClendon.  RT 2387.  She

24   testified that, inter alia, she had been in a relationship with the defendant for two years,

25   Rachal was right-handed, she lived with Rachal for a year, Rachal was friends and had

26   worked with Patterson, and about various other facts concerning Rachal.  Id. at 2387–

27   2400.

28          McClendon also testified as to details of her relationship with Rachal that form the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    basis of petitioner's seventh claim.  For example, she testified that he arrived in the

2    parking garage of her school and "blocked [her] in" with his truck (id. at 2400), he was

3    acting "erratic" and "crazy" at that time and had threatened to kill himself (id. at 2401–02),

4    she reported his behavior to the police and obtained a restraining order (id. at 2403–08),

5    and in April to May of 2011, Rachal said "I can't take too much or I'm going to snap" (id.

6    at 2411).

7         The prosecution also introduced evidence of Google searches performed by

8    petitioner including, e.g., "How to get out of a restaining [sic] order" (id. at 3006); "How to

9    make yourself look different" (id. at 3010.); "Chanda E. Mc Clendon, prostitution charges

10   in Oakland" (id. at 3011); "prostitution in Chowchilla" (id. at 3013); "The difference in a

11   restraining order domestic violence charge from a regular domestic violence charge" (id.

12   at 3014); "What is considered stocking [sic]" (id.); "Can a person other than the victum

13   [sic] say you violated a restraining" (id. at 3015); "stalking but not caught" (id.); "If your

14   girlfriend is a liar what to do" (id.); "hire a private investigator in San Jose to see if your

15   wife cheating" (id.).

16        The California Court of Appeal described the trial proceedings as follows:

17            During trial, defendant objected "as to its relevance" regarding
              the admission of testimony about the incident involving
18            McClendon. The prosecutor argued that the evidence was
              relevant to defendant's mental state around the time of the
19            offense. The trial court found that the proposed testimony
              would be "highly relevant" and that it was admissible.
20

21            Following McClendon's testimony, the prosecutor noted that
              pursuant to a discussion with defendant's trial counsel, the
22            prosecutor had purposely avoided asking McClendon
              questions that would have elicited that defendant had made
23            "some threats [of] violence."

24            During argument to the jury, the prosecutor told the jury that in
              order to understand what defendant did, "you have to
25            understand what's going on in the defendant's mind." The
              prosecutor referred to defendant's reaction to his recent
26            breakup with McClendon and reminded the jury that
              defendant's "mind state at the time" included suicidal thoughts.
27            The prosecutor argued that defendant's Google searches gave
              the jury "a window" into what defendant was thinking at the time
28            and argued that the evidence showed that "[t]hings are
              spiral[]ing out of control to such a degree that he's

                                          54

1

2

3

4

5

> contemplating suicide . . . ." The prosecutor also argued that some of defendant's Google searches showed him contemplating "doing things that aren't that different from what happened to Mr. Patterson." He reminded the jury that defendant had told McClendon, "I can't take too much or I'm going to snap," and he argued, "That's what happened on May 10th, 2011, at defendant's house. He snapped. He couldn't take it anymore, and he took someone with [him], his friend, Ricky Patterson[.]

6

Appellate Opinion at 39–40; see also RT 3415–21 & 3432.

7

8

9

10

11

12

The California Court of Appeal found that the evidence regarding McClendon was relevant to petitioner's state of mind on the day of the stabbing under Cal. Evidence Code section 210 and was admissible as possible motive evidence under Cal. Evidence Code section 1101(b). The appellate court further found that the evidence was not more prejudicial than probative under Cal. Evidence Code section 352. See Appellate Opinion at 40–42.

13

### 2.    Exhaustion

14

15

Respondent argues that the claim was not exhausted in state court and therefore cannot be granted by this court.

16

#### a.    Legal Standard

17

18

19

20

21

22

23

24

25

26

27

28

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are first required to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b) & (c); Rose v. Lundy, 455 U.S. 509, 515–16 (1982). The state's highest court must be given an opportunity to rule on the claims even if review is discretionary. See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (petitioner must invoke "one complete round of the State's established appellate review process"). To comply with the fair presentation requirement, a claim must be raised at every level of appellate review; raising a claim for the first time on discretionary review to the state's highest court is insufficient. Casey v. Moore, 386 F.3d 896, 918 (9th Cir. 2004) (holding that where petitioner only raised

55

1    federal constitutional claim on appeal to the Washington State Supreme Court, the claim

2    was not fairly presented).

3           The exhaustion requirement is not jurisdictional, but rather a matter of comity.  See

4    Granberry v. Greer, 481 U.S. 129, 133–34 (1987).  However, a district court may not

5    grant the writ unless state court remedies are exhausted, there is "an absence of

6    available state corrective process", or "circumstances exist that render such process

7    ineffective".  28 U.S.C. § 2254(b)(1).

8           It is not sufficient to raise only the facts supporting the claim in state court; rather,

9    "the constitutional claim . . . inherent in those facts" must be brought to the attention of

10   the state court.  See Picard v. Connor, 404 U.S. 270, 277 (1971).  Furthermore, a

11   petitioner does not exhaust all possible claims stemming from a common set of facts

12   merely by raising one specific claim.  See Gulbrandson v. Ryan, 738 F.3d 976, 993 (9th

13   Cir. 2013) (mere submission of a relevant affidavit to state court not sufficient to place

14   that court on notice of all potential constitutional challenges stemming from that affidavit);

15   Koerner v. Grigas, 328 F.3d 1039, 1046-48 (9th Cir. 2003) (holding even though factual

16   basis for the claim was submitted to state court, the claim itself was not fairly presented

17   to that court because the facts were used exclusively to support another claim).  Indeed,

18   state courts must be alerted to the fact that prisoners are asserting claims under the

19   United States Constitution in order to be given the opportunity to correct alleged

20   violations of federal rights.  Duncan v. Henry, 513 U.S. 364, 365-66 (1995); Gray v.

21   Netherland, 518 U.S. 152, 162–63 (1996) (characterizing Picard as requiring "reference

22   to a specific federal constitutional guarantee" in state court; presentation of facts

23   underlying claim not sufficient); Fields v. Waddington, 401 F.3d 1018, 1021 (9th Cir.

24   2005) (general reference to federal Constitution "as a whole, without specifying an

25   applicable provision, or an underlying federal legal theory, does not suffice to exhaust the

26   federal claim."); Castillo v. McFadden, 399 F.3d 993, 1000–02 (9th Cir. 2005) (requiring

27   reference to "specific provision of the U.S. Constitution"; statement that appellant was

28   "denied a fair trial in violation of the United States and the Arizona Constitutions"

insufficient).

The petitioner bears the burden of proof that state judicial remedies were properly exhausted.  Parker v. Kelchner, 429 F.3d 58, 62 (3d Cir. 2005); Caver v. Straub, 349 F.3d 340, 345 (6th Cir. 2003); Winck v. England, 327 F.3d 1296, 1304 n.6 (11th Cir. 2003); see Darr v. Burford, 339 U.S. 200, 218–19 (1950) ("petitioner has the burden . . . of showing that other available remedies have been exhausted"), overruled on other grounds, Fay v. Noia, 372 U.S. 391 (1963); Cartwright v. Cupp, 650 F.2d 1103, 1104 (9th Cir. 1981) (affirming summary judgment for respondent because, although petitioner alleged he had exhausted, "there is nothing in the record" to show it).

If available state remedies have not been exhausted as to all claims, the district court must dismiss the petition.  See Rose, 455 U.S. at 510; Guizar v. Estelle, 843 F.2d 371, 372 (9th Cir. 1988).  The court may also deny a habeas petition on the merits even if it is unexhausted.  See 28 U.S.C. § 2254(b)(2); Runningeagle v. Ryan, 686 F.3d 758, 777 n.10 (9th Cir. 2012); see also Jones v. Davis, 806 F.3d 538, 544-45 (9th Cir. 2015) (concluding that, just as courts have discretion to deny a claim on its underlying substantive validity under § 2254(b)(2) without reaching the exhaustion issue, they also have discretion to deny a claim as Teague-barred under § 2254(b)(2) without reaching the exhaustion issue).  But it is not required to do so.  See Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999).

### b.    Analysis

Petitioner argues that the above-described evidence should have been excluded under California's Evidence Code.  He also argues that admission of the evidence resulted in a trial that was fundamentally unfair.  Respondent argues that petitioner's "claim in the state courts was that the admission of the evidence about McClendon was irrelevant under Cal. Evidence Code section 210, inadmissible character evidence under Cal. Evidence Code section 1101(b), and more prejudicial than probative under Cal. Evidence Code section 352, and thus constituted a miscarriage of justice, the standard of prejudice for a state law, non-constitutional violation."  Answer at 49 (citing petitioner's

1  petition for review, opening brief, and reply brief on appeal).  Respondent argues that

2  "Petitioner did not cite any federal cases or the federal Constitution, and did not mention

3  due process" in relation to this claim in his state-court proceedings.  Id.  Petitioner

4  counters that the fact that his state-court filings "lack . . . citation to any federal cases or

5  the federal Constitution, and [do] not mention due process" is irrelevant because "the

6  specific issue was brought to the attention of state courts prior to this this [sic] Court."

7  Traverse at 24 (citing authority stating that citations to state-court cases that analyze

8  federal issues serve the same purpose as citing federal cases).  Although petitioner

9  argues that citations to state-court cases analyzing federal authority are sufficient to

10  present a federal issue, he does not point to any relevant case that he raised in his state-

11  court briefing.

12  Here, petitioner fails to meet his burden to demonstrate that state judicial remedies

13  were properly exhausted.  He does not cite a single filing he made in state court in which

14  he presented this argument.  In fact, only respondent points to petitioner's state-court

15  filings, and upon review this court agrees that petitioner did not fairly present this issue as

16  a federal, Due Process issue to any state court; the underlying facts and arguments were

17  framed solely as state-law issues.  See Petition to Exhaust State Remedies, Answer,

18  Ex. 4 at 29–32 (Petition for Review addressing exclusively arguments based on state

19  law); Appellant's Opening Brief, Answer, Ex. 1 at 73–78; (Appellant's Opening Brief

20  failing to mention any federal issue); Appellant's Reply Brief, Answer, Ex. 3 at 51–55

21  (Appellant's Reply Brief addressing exclusively arguments based on state law).

22  As available state remedies have not been exhausted as to Claim 7, this court

23  must dismiss the claim.  See Rose, 455 U.S. at 510; Guizar, 843 F.2d at 372.  Claim 7 is

24  therefore DISMISSED.

25  **3.    Due Process**

26  Although the court need not do so, it may deny a habeas petition on the merits

27  even if it is unexhausted.  See 28 U.S.C. § 2254(b)(2).

28  Petitioner argues that the trial court admitted "very prejudicial evidence" that was

United States District Court
Northern District of California

58

1    irrelevant to the homicide at issue in the trial which "resulted in a miscarriage of justice".

2    Pet. at 81–86.  Respondent argues that because the Supreme Court has not made a

3    clear ruling that admission of irrelevant or prejudicial evidence constitutes a due process

4    violation sufficient to issue a writ of habeas corpus, the state court's ruling here cannot be

5    an unreasonable application of clearly established Supreme Court law.  Accordingly,

6    respondent argues, habeas relief is unavailable for this claim.  Answer at 49.

                        a.    **Legal Standard**

7

8        The admission of evidence is not subject to federal habeas review unless a

9    specific constitutional guarantee is violated or the error is of such magnitude that the

10   result is a denial of the fundamentally fair trial guaranteed by due process.  See Henry v.

11   Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th

12   Cir.), cert. denied, 479 U.S. 839 (1986).  The Supreme Court "has not yet made a clear

13   ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

14   process violation sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568

15   F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant

16   pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not

17   contrary to, or an unreasonable application of, clearly established Supreme Court

18   precedent under § 2254(d)); Zapien v. Martel, 849 F.3d 787, 794 (9th Cir. 2016)

19   (because there is no Supreme Court case establishing the fundamental unfairness of

20   admitting multiple hearsay testimony, Holley bars any such claim on federal habeas

21   review).

22       Failure to comply with state rules of evidence is not a sufficient basis for granting

23   federal habeas relief on due process grounds.  See Henry, 197 F.3d at 1031; Jammal v.

24   Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  While adherence to state evidentiary

25   rules suggests that the trial was conducted in a procedurally fair manner, it is certainly

26   possible to have a fair trial even when state standards are violated.  See id. (citing Perry

27   v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983), cert. denied, 469 U.S. 838 (1984)).  The

28   due process inquiry in federal habeas review is whether the admission of evidence was

United States District Court
Northern District of California

1   arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  Walters, 45 F.3d

2   at 1357; Colley, 784 F.2d at 990.  Only if there are no permissible inferences that the jury

3   may draw from the evidence can its admission violate due process.  See Jammal, 926

4   F.2d at 920.

                    **b.   Analysis**

6         Here, the California Court of Appeal found that the evidence concerning

7   McClendon was relevant to show petitioner's state of mind on the day of the stabbing: he

8   was "experiencing intense feelings of frustration to the extent that he was contemplating

9   suicide," which provided a possible motive for defendant's commission of the charged

10  offense.  Appellate Opinion at 41.  From the evidence relating to McClendon that showed

11  petitioner was suicidal, erratic, and about to "snap," the jury could have drawn a

12  permissible inference regarding petitioner's mental state at the time of the offense.

13  Accordingly, the trial court's admission of the challenged evidence did not violate

14  petitioner's due process rights, and Claim 7 is DENIED.

15  **G.     Claim 9:  Whether False Testimony Was Allowed to Be Presented at Trial**

16        Petitioner argues that his right to due process was violated when the prosecutor

17  knowingly introduced false evidence in the form of Kevin Johnson's testimony that there

18  was still animosity between petitioner and Patterson over the Willoughby job during the

19  final days leading up to the homicide.  Pet. at 95–97.  The claim deals exclusively with

20  the testimony of Kevin Johnson.  Traverse at 29.  Petitioner argues that the prosecutor

21  was aware of allegedly conflicting statements from numerous other witnesses, such that

22  the prosecutor's introduction of Johnson's testimony violated the clearly-established

23  Supreme Court precedent found in Napue v. Illinois, 360 U.S. 264 (1959).

24                    **1.     Legal Standard**

25        "[A] conviction obtained by the knowing use of perjured testimony is fundamentally

26  unfair, and must be set aside if there is any reasonable likelihood that the false testimony

27  could have affected the judgment of the jury."  United States v. Agurs, 427 U.S. 97, 103

28  (1976) (footnotes omitted); United States v. Bagley, 473 U.S. 667, 678–80 nn.8–9 (1985)

United States District Court
Northern District of California

1   ("'a deliberate deception of court and jury by the presentation of testimony known to be

2   perjured' is inconsistent with 'the rudimentary demands of justice'", and a resulting

3   conviction must be set aside "if there is any reasonable likelihood that the false testimony

4   could have affected the jury's verdict") (quoting Mooney v. Holohan, 294 U.S. 103, 112

5   (1935)).

6        A claim under Napue succeeds when (1) the testimony was actually false, (2) the

7   prosecution knew or should have known that the testimony or evidence was actually

8   false, and (3) the false testimony or evidence was material.  Henry v. Ryan, 720 F.3d

9   1073, 1084 (9th Cir. 2013).

10        First, the testimony must be actually false.  Prosecutors will not be held

11   accountable for discrepancies in testimony where there is no evidence from which to infer

12   prosecutorial misconduct and the fairness of the trial was not materially affected.  See

13   United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995) (no evidence of

14   prosecutorial misconduct where discrepancies in testimony could as easily flow from

15   errors in recollection as from lies) overruled in part on other grounds by Valerio v.

16   Crawford, 306 F.3d 742, 764 (9th Cir. 2002) (en banc); Hayes v. Ayers, 632 F.3d 500,

17   520 (9th Cir. 2011) (defendant failed to show that witness's "mostly equivocal" statements

18   about when she received immunity or whether she actively sought immunity were actually

19   false or that the prosecutor knew as much).

20        Second, the prosecution must have known or should have known that the

21   testimony or evidence was actually false.  A claim that only the witness knew his

22   testimony was false, and not that the prosecutor also had such knowledge, does not

23   adequately allege a violation of clearly established federal law under Napue.  Reis-

24   Campos v. Biter, 832 F.3d 968, 977 (9th Cir. 2016) (rejecting claim that only police

25   investigator knew his testimony was false).  Conclusory assertions will not do.  See id.

26   (finding that petitioner's conclusory assertion that any testimony inconsistent with the

27   truth must be not only inaccurate but also perjured, does not constitute evidence

28   sufficient to make out a Napue claim).  Petitioner must establish a factual basis for

61

1  attributing to the government knowledge that the testimony was perjured.  See Morales v.

2  Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004).

3      Third, the false testimony must be material.  "Material" means that there is a

4  reasonable likelihood that the false evidence or testimony could have affected the

5  judgment of the jury.  Morris v. Ylst, 447 F.3d 735, 743 (9th Cir. 2006).  "Napue requires

6  us to determine only whether the error *could* have affected the judgment of the jury,

7  whereas ordinary harmless error review requires us to determine whether the error *would*

8  have done so."  Dow v. Virga, 729 F.3d 1041, 1048 (9th Cir. 2013).  This element may be

9  satisfied by a showing that the perjured testimony or false evidence "could reasonably be

10  taken to put the whole case in such a different light as to undermine confidence in the

11  verdict."  Kyles v. Whitley, 514 U.S. 419, 435 (1995).

12      **2.     Analysis**

13      A claim under Napue will succeed when (1) the testimony was actually false,

14  (2) the prosecution knew or should have known that the testimony or evidence was

15  actually false, and (3) the false testimony or evidence was material.  Henry, 720 F.3d at

16  1084.

17      First, petitioner argues that Kevin Johnson falsely testified that there still existed

18  animosity between petitioner and Patterson over the Willoughby job during the final days

19  leading up to the homicide.  Petitioner argues that statements of Steven Friendly, Cora

20  Coloma, Sandy Tellez, and the Alcantars all showed that, contrary to Johnson's

21  testimony, petitioner and Patterson were on seemingly friendly terms the night before the

22  incident.  Accordingly, petitioner argues that the truth was that there was no longer

23  animosity between the two men over the Willoughby job.  Pet. at 96.

24      Petitioner's argument is unavailing.  In the first instance, petitioner does not cite to

25  the record indicating any false statements that Johnson made at trial, nor does he cite to

26  any conflicting statements made by other witnesses.  Instead, he offers conclusory

27  summaries claiming that "Johnson was allowed to testify to the jury that there still existed

28  animosity between Petitioner and Patterson over the Willoughby job during the final days

United States District Court
Northern District of California

1   leading up to the homicide" and that "statements of Steven Friendly, Cora Coloma, Sandy

2   Tellez and the Alcantars had already been taken by the People's own investigator, and

3   the fact that Petitioner and Patterson were on seemingly friendly terms the night before

4   the incident was well known."  Id. at 96.  Contrary to petitioner's argument, respondent's

5   citations to the record make clear that Johnson's testimony did not pinpoint Rachal's and

6   Patterson's animosity to the "final days leading up to the homicide."  Rather, Johnson

7   testified that he was not positive about the timing of his observations of animosity, but

8   estimated it was between a month and six months before Patterson died; he had told the

9   prosecution's investigator these conversations occurred about a month or a month and a

10  half before Patterson died.  RT 2698–2702.  On cross-examination Johnson said he did

11  not recall the dates of those conversations.  Id. at 2711–12.  Of course, petitioner does

12  not dispute that he and Patterson had disagreements during that general time period, but

13  instead argues that Johnson's statements were false because they pinpointed the timing

14  of animosity to the "final days leading up to the homicide."  Yet, petitioner identifies no

15  such testimony.

16          Even if petitioner had identified such time-specific testimony from Johnson, it is

17  merely speculative that such testimony would have been false.  Petitioner does not

18  identify any contrary testimony from other witnesses, and the facts that "the men were

19  actually spending time together the night before and the morning of the incident" and that

20  it was generally "well known" that "Petitioner and Patterson were on seemingly friendly

21  terms the night before the incident" are insufficient to demonstrate that they were in fact

22  on friendly terms, or that underlying animosity did not continue.  Pet. at 96–97; Traverse

23  at 30.  And other record evidence—and petitioner's own arguments—suggest that

24  animosity was in fact ongoing.  E.g., RT 1851–53 ("On the note itself, do you see

25  something to the effect of: '$5,000 Ricky stole my money'? A. Yes."); RT 2384

26  (discussing Trial Ex. 100); Pet. at 27 ("the evidence at trial clearly showed that (1) there

27  was large amounts of ill-will and animosity harbored by Patterson") (citing RT 2681–82 &

28  2694).

For the above reasons, this court cannot conclude that Johnson's testimony was actually false or that the prosecution knew or should have known that the testimony or evidence was actually false under Napue.

Accordingly, Claim 9 is DENIED.

### H.   Claims 5, 6, 8, and 10:  Ineffective Assistance of Counsel

The court next addresses petitioner's arguments alleging that his trial counsel was ineffective to a degree that violated his constitutional rights.  These ineffective assistance of counsel arguments make up petitioner's fifth, sixth, eighth, and tenth claims.

### 1.   Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things.  **First**, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at 687–88, see also Andrus v. Texas, 140 S. Ct. 1875, 1881 (2020) (per curiam).  **Second**, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694; Andrus, 140 S Ct. at 1881.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

**First**, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  See Strickland, 466 U.S. at 687. The defendant must show that counsel's representation fell below an objective standard

United States District Court
Northern District of California

of reasonableness under prevailing professional norms at the time counsel represented the defendant. See id. at 688; Wiggins v. Smith, 539 U.S. 510, 522-23 (2003) (citing American Bar Association professional standards and standard practice in capital defense at pertinent time); see also Jones v. Ryan, 52 F.4th 1104, 1117 (9th Cir. 2022) (citing ABA Guidelines in death penalty cases in support of determination that trial counsel was constitutionally ineffective by failing to secure mental health expert in advance of capital sentencing hearing).

Under this objective approach, the court must "'affirmatively entertain' the range of possible reasons counsel might have proceeded as he or she did." Jones, 52 F.4th at 1116 (quoting Cullen, 563 U.S. at 196). The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689. "Although courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" Harrington, 562 U.S. at 109 (quoting Yarborough v. Gentry, 540 U.S. 1, 8 (2003)) (citation omitted) (attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities); Cullen, 563 U.S. at 196 ("Strickland specifically commands that a court 'must indulge the strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'") (quoting Strickland, 466 U.S. at 689–90).

Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision

based upon investigation; and (3) the decision appears reasonable under the circumstances.  See Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).  Whether counsel's actions were indeed tactical is a question of fact considered under 28 U.S.C. § 2254(d)(2); whether those actions were reasonable is a question of law considered under 28 U.S.C. § 2254(d)(1).  Edwards v. LaMarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  The petitioner bears the burden of rebutting the strong presumption that strategic decisions by counsel are reasonable, and the absence of evidence cannot overcome the presumption.  Dunn v. Reeves, 141 S. Ct. 2405, 2410 (2021) (per curiam).

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot even establish incompetence under the first prong.  May v. Shinn, 954 F.3d 1194, 1203 (9th Cir. 2020) ("We also need not decide whether May has satisfied the prejudice prong of Strickland because his claim fails on the performance prong."); Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

**Second**, the defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable.  Strickland, 466 U.S. at 688.  The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id. at 694.

On a claim of ineffectiveness for failure to request a jury instruction on a lesser included offense, the prejudice analysis requires an assessment of the likelihood the jury would have convicted only on the lesser included offense.  Crace v. Herzog, 798 F.3d at 847–50 (9th Cir. 2015).  Where the defendant is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'"  Hinton v. Alabama, 571 U.S. 263, 275 (2014) (quoting Strickland, 466 U.S. at 695); Luna v. Cambra, 306 F.3d 954, 961 (9th Cir. 2002) (same).

1   In order to establish prejudice from failure to object, petitioner must show that

2   (1) had his counsel objected, it is reasonable that the trial court would have sustained the

3   objection as meritorious, and (2) had the objection been sustained, it is reasonable that

4   there would have been an outcome more favorable to him.  See Wilson v. Henry, 185

5   F.3d 986, 990 (9th Cir. 1999).

6   A court need not determine whether counsel's performance was deficient before

7   examining the prejudice suffered by the defendant as the result of the alleged

8   deficiencies.  See Strickland, 466 U.S. at 697; Williams v. Calderon, 52 F.3d 1465, 1470

9   & n.3 (9th Cir. 1995), cert. denied, 516 U.S. 1124 (1996).

10   A "doubly" deferential judicial review is appropriate in analyzing ineffective

11   assistance of counsel claims under § 2254.  See Cullen, 563 U.S. at 200–02; Harrington,

12   562 U.S. at 105 (same); Premo v. Moore, 562 U.S. 115, 122 (2011) (same).  The general

13   rule of Strickland, i.e., to review a defense counsel's effectiveness with great deference,

14   gives the state courts greater leeway in reasonably applying that rule, which in turn

15   "translates to a narrower range of decisions that are objectively unreasonable under

16   AEDPA."  Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) (citing Yarborough,

17   541 U.S. at 664).  When § 2254(d) applies, "the question is not whether counsel's actions

18   were reasonable.  The question is whether there is any reasonable argument that

19   counsel satisfied Strickland's deferential standard."  Harrington, 562 U.S. at 105.  "[I]f a

20   fairminded jurist could agree with either [the] deficiency or prejudice holding, the

21   reasonableness of the other is 'beside the point.'"  Shinn v. Kayer, 592 U.S. 111, 120

22   (2020) (quoting Wetzel v. Lambert, 565 U.S. 520, 524 (2012) (per curiam)).

23   **2.      Analysis**

24   In claims 6 and 10, petitioner contends he received ineffective assistance of

25   counsel because (a) his attorney asked that the jury not be instructed on manslaughter.

26   In Claim 6 petitioner argues that he received ineffective assistance when (b) his counsel

27   failed to object when the trial court gave the CALCRIM jury instruction number 506 using

28   the conjunctive "and" instead of the disjunctive "or".  Additionally, petitioner's claims 5

United States District Court
Northern District of California

1   and 6 both argue that he received ineffective assistance of counsel because (c) his

2   attorney failed to object to prosecutorial misconduct.  Finally, petitioner's eighth claim

3   alleges that (d) his trial counsel was ineffective in presenting his claim of self-defense.

### a.        Request to Forgo Instructions on Manslaughter

5          Petitioner argues that his trial counsel's request that the jury not be instructed on

6   the lesser included offense of manslaughter over the objection of his client constituted

7   ineffective assistance.  Petitioner argues that trial counsel's decision "[t]o go 'all or

8   nothing' on a case with so much at stake was not only error, but just shows how

9   ineffective Mr. Rachal's counsel was."  Traverse at 21; see also Pet. at 97–101.

10  Petitioner argues that any reasonable attorney would have realized that manslaughter

11  instructions were imperative "in a case where there were thirty-seven (37) stab wounds,

12  clearly giving rise to an argument of an over-reaction (i.e., imperfect self-defense)."

13  Traverse at 22.

14         Petitioner also argues that trial counsel did not understand the *sua sponte*

15  obligations of the trial court to instruct on the lesser included offense even over his

16  objection.  Petitioner argues that trial counsel's strategy was unreasonable and in direct

17  conflict with the law.  Finally, petitioner argues that his argument should be found

18  meritorious notwithstanding the California Court of Appeal's treatment of the issue

19  because there now exists additional evidence that differs from the appellate record

20  concerning the decision to forgo manslaughter instructions.  Pet. at 98.

21         The California Court of Appeal found no ineffective assistance as a result of trial

22  counsel's decision not to have the court instruct on manslaughter, stating:

23              The decision to forego manslaughter instructions in this case,
                in order to avoid a compromise verdict, was a reasonable
24              tactical decision "in light of the evidence." (*Cooper, supra*, 53
                Cal.3d at p. 832.) Most significantly, after his fall or jump from
25              the overpass, defendant stated, "He had a knife. He came at
                me." Trial counsel could reasonably determine that this
26              statement was consistent with a self-defense verdict but
                inconsistent with a manslaughter verdict. That is, if the jury had
27              believed defendant's statement, it would necessarily have
                believed that defendant did not kill Patterson in a sudden
28              quarrel or heat of passion or due to an unreasonable belief in

United States District Court
Northern District of California

the need to defend himself. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 583 ["an intentional killing is reduced to voluntary manslaughter if . . . the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation . . . , or kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense"].) To have argued for a manslaughter verdict might have "undercut the credibility of the defense." (*Cooper, supra*, 53 Cal.3d at p. 832.) As defendant's trial counsel's actions """"can be explained as a matter of sound trial strategy,"" we conclude that "'counsel's performance fell within the wide range of professional competence"" and that defendant did not receive ineffective assistance of counsel when his trial counsel requested that the trial court not give manslaughter instructions. (*Lopez, supra*, 42 Cal.4th at p. 966.)

Appellate Opinion at 38.

Both petitioner and trial counsel testified about this issue during the postconviction evidentiary hearing in Superior Court concerning the habeas petition. Petitioner testified that counsel informed him that counsel was the "captain of the ship" and that petitioner had no say in what jury instructions to request. Petitioner said he always wanted the jury to be instructed on manslaughter. See Evidentiary Hearing Reporter's Transcript of Proceedings Held on December 7, 10, 2018, Pet., Ex. L at 18–19. Trial counsel told the judge that petitioner agreed with counsel's decision not to request manslaughter instructions, but petitioner now argues that he told counsel at the time that he did not agree, and continued to "tap him and grudge him." Id. at 44–46. Petitioner testified that his trial counsel Mr. Lempert lied to the court. Id. at 46 ("Lempert reported to the Court that I was in agreement with him when I was not."). Petitioner claims he did not tell the court he disagreed with counsel's representation during the trial because that would have been "out of place." Id. at 47. However, petitioner acknowledged that at a later time he spoke up and told the judge he wanted manslaughter instructions. Id. at 48–49.

Counsel did not recall seeing gestures during any discussion about lesser included instructions, and he testified that he would have informed the court if he had seen such conduct. Id. at 101–02. Counsel claimed that he would not have stated that petitioner agreed to omit the manslaughter instructions if that had not been true. Id. at 103–04. Counsel regularly informed his clients that the court is required to instruct on manslaughter if there is evidence to support a lesser included offense, even over

counsel's objection.  Id. at 114.

In light of the foregoing testimony, the Superior Court addressed the question whether counsel's decision fell below the standard of care, finding that it did not because the conclusion that manslaughter instructions would undermine and weaken petitioner's self-defense argument was not unreasonable.  See Sup. Ct. Habeas Decision at 3962–64.  Following the evidentiary hearing, that court reasoned:

> The court finds Lempert to be a credible witness regarding the circumstances of the decision not to request manslaughter instructions. As noted above, there were sound reasons to justify Lempert's decisions. In contrast, Petitioner's testimony is self-serving and, in light of the circumstances surrounding his belated statement to the court that he wanted manslaughter instructions, his testimony does not persuade the court that he declined to express his disagreement with the decision because he felt bullied or had no say on the matter. Petitioner's testimony on this issue was not credible.
>
> Petitioner has also failed to demonstrate that another attorney would have acted differently than Lempert under the same circumstances. Even if another attorney would have made a different decision, that would not prove that the decision Lempert made was outside the range of reasonable competence. Further, Petitioner has failed to persuade the court that he was prejudiced by Lempert's alleged incompetence. Petitioner failed to prove it is reasonably likely a different result would have occurred if manslaughter instructions had been given.
>
> For the reasons discussed above, the court finds it was not ineffective assistance of counsel to forego manslaughter instructions in the trial.

Id. at 3966–67.

On this court's review pursuant to § 2254, a "doubly" deferential judicial review is appropriate.  See Cullen, 563 U.S. at 190 ("We take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)") (internal citations and quotation marks omitted).  "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold."  Knowles, 556 U.S. at 123 (internal quotation marks omitted); Harrington, 562 U.S. at 105 ("[T]he question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable

1   argument that counsel satisfied Strickland's deferential standard.").  On a claim of

2   ineffectiveness for failure to request a jury instruction on a lesser included offense, the

3   prejudice analysis requires an assessment of the likelihood the jury would have convicted

4   only on the lesser included offense.  Crace, 798 F.3d at 847–50.

5        Regarding counsel's alleged deficiency in performance, a difference of opinion as

6   to trial tactics does not constitute denial of effective assistance (see United States v.

7   Mayo, 646 F.2d 369, 375 (9th Cir. 1981)), and tactical decisions are not ineffective

8   assistance simply because in retrospect better tactics are known to have been available

9   (see Bashor, 730 F.2d at 1241).  Tactical decisions of trial counsel deserve deference

10  when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel

11  makes an informed decision based upon investigation; and (3) the decision appears

12  reasonable under the circumstances.  See Sanders, 21 F.3d at 1456.

13       First, although petitioner now disagrees with the merits of the decision, it is clear

14  that trial counsel in fact based his decision to forego manslaughter instructions on

15  strategic considerations.  See RT 3159–61 (trial counsel explaining on the record at the

16  time of trial why he did not want manslaughter instructions, which he believed were

17  unwarranted and would detract from the self-defense argument); see also, e.g., Sup. Ct.

18  Habeas Decision at 3962–67; Appellate Opinion at 38.  The Superior Court that presided

19  over the post-conviction evidentiary hearing agreed, finding petitioner's testimony self-

20  serving and trial counsel's testimony credible in reasoning that "there were sound

21  reasons to justify Lempert's decisions."  Sup. Ct. Habeas Decision at 3966.

22       Second and third, this court finds the California Court of Appeal's and Superior

23  Court's conclusions that trial counsel made an informed, reasonable decision under the

24  circumstances to be reasonable.  While failure to give the manslaughter instruction was

25  erroneous (Appellate Opinion at 24–26), the California Court of Appeal reasoned that

26  "[t]he decision to forego manslaughter instructions in this case, in order to avoid a

27  compromise verdict, was a reasonable tactical decision 'in light of the evidence'" (id. at

28  38).  The Superior Court reached the same conclusion after conducting an evidentiary

1   hearing, reasoning that "there were sound reasons to justify Lempert's decisions", and

2   "[e]ven if another attorney would have made a different decision, that would not prove

3   that the decision Lempert made was outside the range of reasonable competence."  Sup.

4   Ct. Habeas Decision at 3966–67.

5   Trial counsel's evidentiary presentation and theory of the case hinged in large

6   part—and continues to do so—on petitioner's statement that Patterson had a knife and

7   came at him.  This unambiguously supported petitioner's self-defense theory, and as trial

8   counsel and the California Court of Appeal reasoned, introduction of manslaughter

9   instructions may have confused the focus on that theory.  In light of the contemporaneous

10  and post-conviction explanations of petitioner's trial strategy, the fact that the self-

11  defense-focused strategy was presented at trial, and the fact that petitioner's trial

12  presentation did not advance or meaningfully attempt to advance theories of heat of

13  passion or unreasonable overreaction, this court finds that the California Court of

14  Appeal's decision and the Superior Court's decision were not unreasonable.  Respondent

15  has advanced reasonable arguments that trial counsel satisfied Strickland's deferential

16  standard when tactically pursuing a self-defense strategy to the exclusion of a

17  manslaughter defense and associated jury instructions.  See generally Butcher v.

18  Marquez, 758 F.2d 373, 376 (9th Cir. 1985) ("Under the Strickland test, counsel's

19  strategic choice to forgo an instruction for voluntary manslaughter was reasonable

20  because counsel had good cause to believe that further efforts to obtain such an

21  instruction would harm Butcher's case. . . .  Defense counsel need not request

22  instructions inconsistent with its trial theory."); Crow v. Haynes, No. 20-35911, 2021 WL

23  5122171, at *3 (9th Cir. Nov. 4, 2021) (counsel's strategic decision, as demonstrated by

24  his statement that he had thought for a long time about whether to request manslaughter

25  instructions but ultimately declined to do so, was not ineffective assistance); Ruth v.

26  Glebe, 715 Fed. App'x 644, 647 (9th Cir. 2017) ("a defense attorney may make a

27  'strategic decision' not to request a lesser-included offense instruction"); Matylinsky v.

28  Budge, 577 F.3d 1083, 1092 (9th Cir. 2009) (no ineffective assistance resulted from

United States District Court
Northern District of California

1    failure to request instructions on manslaughter and provocation).  Accordingly, Claim 10

2    is DENIED, and Claim 6 is DENIED to the extent it relies on counsel's actions concerning

3    manslaughter instructions.

4         Since "a fairminded jurist could agree" with the deficiency holding, "the

5    reasonableness of the other [prejudice question] is 'beside the point.'"  Kayer, 592 U.S. at

6    120 (quoting Wetzel, 565 U.S. at 524).

7                   **b.    CALCRIM No. 506**

8         Next, petitioner argues that trial counsel's representation was ineffective when he

9    failed to object to the error in the instruction on defense within the home, CALCRIM

10   No. 506.  Traverse at 23.  Petitioner argues that there can be no satisfactory explanation

11   why Rachal's trial counsel would acquiesce in an instruction which increased the burden

12   to show justifiable homicide in the home.  As discussed above, the California Court of

13   Appeal recognized that an erroneous instruction was given and "concluded that the

14   erroneous instruction was harmless beyond a reasonable doubt."  Appellate Opinion at

15   39.  This court inquires whether "a fairminded jurist could agree with either [the]

16   deficiency or prejudice holding".  Kayer, 592 U.S. at 120.

17        For the reasons discussed in Section D above concerning Claim 4, this court finds

18   that a fairminded jurist could agree with the California Court of Appeal's holding that the

19   erroneous instruction was harmless beyond a reasonable doubt.  Accordingly, petitioner's

20   claim of ineffective assistance of counsel based on the failure to object to the erroneous

21   CALCRIM No. 506 jury instruction fails and Claim 6 is DENIED to the extent it relies on

22   counsel's actions concerning the erroneous CALCRIM No. 506 instruction.

23                 **c.    Prosecutorial Misconduct**

24        Petitioner argues that his trial counsel was constitutionally deficient due to his

25   failure to object to certain instances of alleged prosecutorial misconduct, when the

26   prosecutor (1) misstated the law, (2) appealed to the sympathies of the jurors, (3) injected

27   his personal opinion of the evidence into the trial, and (4) attacked defense counsel.

28   Traverse at 18.  He also argues these instances of ineffective assistance justify this court

United States District Court
Northern District of California

73

1  reviewing procedurally defaulted claims of prosecutorial misconduct under the "cause

2  and prejudice" standard.  Id. at 20; Pet. at 68.

3      In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

4  petitioner must establish two things.  First, he must establish that counsel's performance

5  was deficient, i.e., that it fell below an "objective standard of reasonableness" under

6  prevailing professional norms.  Strickland, 466 U.S. at 687–88.  The petitioner bears the

7  burden of rebutting the strong presumption that strategic decisions by counsel are

8  reasonable, and the absence of evidence cannot overcome the presumption.  Dunn, 141

9  S. Ct. at 2410.  Second, he must establish that he was prejudiced by counsel's deficient

10  performance, i.e., that "there is a reasonable probability that, but for counsel's

11  unprofessional errors, the result of the proceeding would have been different."

12  Strickland, 466 U.S. at 694; Andrus, 140 S Ct. at 1881.  On this court's review, petitioner

13  must overcome the a "doubly" deferential judicial review that asks "not whether counsel's

14  actions were reasonable", but instead "whether there is any reasonable argument that

15  counsel satisfied Strickland's deferential standard."  Harrington, 562 U.S. at 105.

16      First, regarding counsel's performance, the Ninth Circuit has repeatedly found that

17  counsel's failure to object to the prosecutor's argument may constitute a reasonable

18  tactical decision.  Demirdjian v. Gipson, 832 F.3d 1060, 1072-1073 (9th Cir. 2016) (state

19  court could reasonably presume that defense counsel made a reasonable tactical

20  decision to address prosecutor's closing arguments in his own closing argument instead

21  of objecting); Cunningham v. Wong, 704 F.3d 1143, 1159 (9th Cir. 2013) (defense

22  counsel's decision not to object to prosecutor's closing argument comments, "possibly to

23  avoid highlighting them," was a reasonable strategic decision); United States v. Molina,

24  934 F.2d 1440, 1448 (9th Cir. 1991) ("From a strategic perspective, for example, many

25  trial lawyers refrain from objecting during closing argument to all but the most egregious

26  misstatements by opposing counsel on the theory that the jury may construe their

27  objections to be a sign of desperation or hyper-technicality."); United States v.

28  Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from

United States District Court
Northern District of California

objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct.").

Second, in order to establish prejudice from a failure to object, petitioner must show that (1) had his counsel objected, it is reasonable that the trial court would have sustained the objection as meritorious "because trial counsel cannot have been ineffective for failing to raise a meritless objection" (Juan H., 408 F.3d at 1273); and (2) had the objection been sustained, it is reasonable that there would have been an outcome more favorable to him.  See Wilson, 185 F.3d at 990.  In determining prejudice, "it is appropriate to consider whether the jury was instructed to decide solely on the basis of the evidence rather than counsel's arguments, and whether the state's case was strong."  Furman v. Wood, 190 F.3d 1002, 1006 (9th Cir. 1999); accord Allen v. Woodford, 395 F.3d 979, 997 (9th Cir. 2004).

### (1)    Misstatements of Law

Petitioner argues that his trial counsel was constitutionally deficient because he failed to object to the prosecutor's misstatements of law regarding the necessary requirements for Rachal to use force in self-defense while in his home during closing arguments.  Specifically, defense counsel failed to object when the prosecutor said the following:

> The law says: "Hey, look, when somebody is trying to break in your house, and they actually do break in your house, and you don't want them there, you can presume that they are there to do you harm." . . . .

> The law actually gives you a presumption that your fear would be reasonable. And I agree. But that's not what happened here. And this presumption actually applies if that's what happened. If there was, in fact, an intruder unlawfully and forcefully entering or about to enter. . . . .

> So, yes, there is a presumption. Ladies and gentlemen, you don't need it. If you find that Ricky Patterson broke into that house with murder on his mind, send this man home. That's not what happened.

RT 3449–50.

1
Petitioner argues that the objectionable portion of that argument was: "If you find

2
that Ricky Patterson **broke into that house with murder on his mind**, send this man

3
home." Id. (emphasis added). Petitioner correctly argues that the CALCRIM No. 506

4
instruction concerning self-defense in the home required less, namely only the

5
reasonable belief that Patterson intended to or tried to commit the crime of assault with a

6
deadly weapon, or tried to enter or did enter that home intending to commit an act of

7
violence. See, e.g., RT 3393.

8
Respondent argues that the prosecutor did not misstate the law. Even if he did, it

9
was not unreasonable for counsel to respond to the prosecutor's argument in his own

10
closing argument by referring the jury to the instructions rather than by objecting. Finally,

11
respondent argues that petitioner has not shown that defense counsel's error, if any, was

12
prejudicial.

13
The California Court of Appeal held:

> The challenged comment was made in the context of the
> prosecutor's discussion of the presumption set forth in section
> 198.5: that a person held "a reasonable fear of imminent peril
> of death or great bodily injury" if he or she used "force intended
> or likely to cause death or great bodily injury within his or her
> residence" against a person who "unlawfully and forcibly
> entered" the residence. The prosecutor told the jurors, "[Y]ou
> don't need [that presumption]. If you find that Ricky Patterson
> broke into that house with murder on his mind, send [defendant]
> home. That's not what happened."
>
> "[I]t is misconduct for the prosecutor to misstate the applicable
> law [citation]." (*People v. Boyette* (2002) 29 Cal.4th 381, 435.)
> Here, the prosecutor's comment did not state that the jury could
> find defendant acted in self-defense within his home only if
> Patterson broke in with "murder on his mind." In context, the
> prosecutor was telling the jury that it did not need to even
> consider whether the section 198.5 presumption applied if
> Patterson was thinking of killing defendant when he entered
> defendant's residence.
>
> Even assuming the prosecutor misstated the law, an objection
> would not have been futile and an admonition would have been
> effective. (See *Fuiava, supra*, 53 Cal.4th at p. 679.) Defendant's
> trial counsel could have requested the trial court tell the jury the
> correct legal standard. However, defendant's trial counsel was
> not ineffective for failing to object and request an admonition.
> "[D]eciding whether to object is inherently tactical, and the
> failure to object will rarely establish ineffective assistance.

76

1

2

3

4

5

> [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 419.) The record indicates defendant's trial counsel made a tactical decision to respond to the prosecutor's comments by reading the jury the requirements for CALCRIM No. 506 during his own argument. (See *People v. Welch* (1999) 20 Cal.4th 701, 764 (*Welch* ).) This decision was reasonable, particularly since the jury was also instructed to follow the trial court's instructions on the law and that if "the attorneys' comments on the law conflict with [the] instructions, you must follow [the] instructions." (See CALCRIM No. 200.)

6 Appellate Opinion at 31–32.

7      This court agrees with respondent that the California Court of Appeal made a

8 reasonable determination that petitioner's challenged statements did not constitute

9 misstatements of law.  The prosecutor stated:  "If you find that Ricky Patterson broke into

10 that house with murder on his mind, send this man home.  That's not what happened."

11 This is not a misstatement of the law.  And as the California Court of Appeal reasoned,

12 the prosecutor "did not state that the jury could find defendant acted in self-defense within

13 his home *only* if Patterson broke in with 'murder on his mind.'"  Appellate Opinion at 31

14 (emphasis added).  Petitioner argues that the prosecutor "misstated the law by

15 characterizing the law as *requiring* a much more difficult set of circumstances then [sic] is

16 actually required for the People to disprove self-defense" (Pet. at 70 (emphasis added))—

17 namely, that Patterson had entered the home with murder on his mind.  But the

18 prosecutor gave an example of why the jury might "send this man home", not the only

19 way it might do so (RT 3449–50).

20      Moreover, that example followed a more complete discussion of the presumption

21 set forth in section 198.5.  In that context, he said immediately before the statement

22 petitioner challenges that "The law says: 'Hey, look, when somebody is trying to break in

23 your house, and they actually do break in your house, and you don't want them there,

24 you can presume that they are there to do you harm.' . . . .  The law actually gives you a

25 presumption that your fear would be reasonable.  And I agree.  But that's not what

26 happened here.  And this presumption actually applies if that's what happened."

27 RT 3449.  This explanation does not harp or hinge on Patterson's intent on entry.

28      The California Court of Appeal also reasonably found that "defendant's trial

77

1   counsel was not ineffective for failing to object and request an admonition" even had the

2   prosecutor's comment been a misstatement of law.  Appellate Opinion at 31.  That is

3   because, as the appellate court reasonably held, "[t]he record indicates defendant's trial

4   counsel made a tactical decision to respond to the prosecutor's comments by reading the

5   jury the requirements for CALCRIM No. 506 during his own argument.  This decision was

6   reasonable, particularly since the jury was also instructed to follow the trial court's

7   instructions on the law and that if the attorneys' comments on the law conflict with the

8   instructions, you must follow the instructions."  Id. at 31–32 (citations and internal

9   quotation marks omitted).  Nor did the conduct lead to a fundamentally unfair trial.

10      The California Court of Appeal based its ruling on a "reasonable argument that

11  counsel satisfied Strickland's deferential standard" (Harrington, 562 U.S. at 105) such

12  that "a fairminded jurist could agree with" the holding (Kayer, 592 U.S. at 120).  And even

13  if constitutional error occurred, petitioner has not shown that it was prejudicial for the

14  reasons described above.  Accordingly, petitioner's claim of ineffective assistance of

15  counsel based on the prosecutor's alleged misconduct of misstating the law fails.

16                          **(2)    Appeals to Sympathy**

17      Petitioner argues that his trial counsel was constitutionally deficient because he

18  failed to object to the prosecutor's appeals to juror sympathy.  Specifically, counsel failed

19  to object when, during closing argument, the prosecutor made statements concerning

20  killing animals, calling self-defense a license to kill, and referring to the fact that

21  petitioner's expert witness was paid.  Such statements include:

22  - "Sometimes I think we, in the Bay Area, a lot of us are animal lovers.

23     Imagine what you might think if someone did this to a dog or cat.  Who

24     would think for one millisecond that that was anything but a sadistic, evil

25     person?"  RT 3445.

26  - "So, let's just talk briefly about lawful self-defense.  A license to kill."  Id. at

27     3446.

28  - "There are certain rules that apply to this license to kill."  Id.

- "That's a license to kill.  This defendant had no license to kill in this case." Id. at 3447.

- "What does her over $6,000 worth of testimony tell us?  And I didn't have the heart, ladies and gentlemen, to ask her how much she would make over that lunch hour." Id. at 3462.

- "There is an incentive to tell you about possibilities, no matter how reasonable, no matter how unreasonable, because that gets them called into court to get paid $600 an hour to wait in that hallway and give you possibilities." Id. at 3537–38.

First, the California Court of Appeal observed that the prosecutor did not in fact argue that petitioner had committed animal abuse and that the term "sadistic" was also in a jury instruction.  Appellate Opinion at 32–33; see also CALCRIM Nos. 521 (first degree murder) & 733 (murder with torture).  The court also reasoned that trial counsel was not ineffective for failing to object because he made a reasonable tactical decision to respond to the prosecutor's remarks in his own argument.  Appellate Opinion at 32–33.  And defense counsel meaningfully responded to that argument, saying that the prosecutor "tried to appeal to your emotions by comparing to what happened to [Patterson] to your feelings if the knife wounds had been used on a dog or a cat in the hope that you would consider [Patterson] in the same way you would feel for a dog or a cat.  A dog and a cat are defenseless animals.  They love people, by and large.  They don't carry knives.  They don't sneak into a house trying to kill you.  Why would he use that example?  Just to pull at your heart strings, to hope that you will make an emotional decision rather than one based on facts." RT 3527.

Second, the California Court of Appeal reasoned that trial counsel's failure to object to the prosecutor's argument about self-defense being a "license to kill" was a tactical decision.  Trial counsel "discussed each element of self-defense as provided by CALCRIM No. 505" with the jury, showing he likely "determined that it would be more effective to respond to the prosecutor's argument by focusing on the facts and the

79

wording of the self-defense instruction."  Appellate Opinion at 33.

Third, the California Court of Appeal found it was not improper for the prosecutor to comment on the defense expert's fees, and that trial counsel's failure to object appeared to be a tactical decision to respond during his own argument.  Appellate Opinion at 34; see also Stevens v. Davis, No. C 09-00137 WHA, 2018 WL 659135, at *12 (N.D. Cal. Feb. 1, 2018) ("both sides are allowed to suggest that an expert witness is biased because he received payment for his testimony") (citing United States v. Preciado-Gomez, 529 F.2d 935, 942 (9th Cir. 1976) ("The existence of bias or prejudice of one who has expressed an expert opinion can always be examined into on cross-examination of such expert")).  Trial counsel in fact responded to the prosecutor's comments, saying that he would not "dignify [the prosecutor's] attack on Doctor Melinek's compensation.  That was paid to her by the county.  Those fees were paid only after [the presiding judge] was satisfied that the fees were reasonable and proper.  To suggest that she earns $840,000 a year and, therefore, for some reason you should disregard her testimony is absurd."  RT 3527.

The California Court of Appeal based its ruling on a "reasonable argument that counsel satisfied Strickland's deferential standard" (Harrington, 562 U.S. at 105) such that "a fairminded jurist could agree with" the holding (Kayer, 592 U.S. at 120).  And even if constitutional error occurred, petitioner has not shown that it was prejudicial for the reasons described above.  Accordingly, petitioner's claim of ineffective assistance of counsel based on the prosecutor's alleged appeals to juror sympathy fails.

### (3)     Personal Opinion

Petitioner argues that his trial counsel was constitutionally deficient because he failed to object to the prosecutor's statements of personal opinion.  Petitioner argues that during closing arguments, the prosecutor improperly stated his personal opinion concerning the facts a number of times, for example:

- "I can't think of a more idiotic, stupid way to go over to your friend's house with an intent to injure or kill him than to do it in your own truck, lock the

doors so you can't make a speedy getaway, put the club device on the steering wheel so it takes even longer to get out of there, during the day when everybody can see you and your car, and then, of course, leave not one shred of evidence that he had murder or assault or an attack on his mind." RT 3447–48.

- "I think probably the thing that illustrates the lack of Mr. Patterson's intent in this area is something as simple as Mr. Johnson was talking about why he was able to listen in on Mr. Patterson and the defendant's conversations as they are driving up to Berkeley.  And the phone was on the speaker.  Do you remember why he said the phone was on speaker?  It's that hands-free law that we all know about, and so many people have intentionally or unintentionally flouted over the year and a half or so it's been around.  This is a man who properly follows the hands-free law.  Yet, they want to tell you he's an attempted murderer and attempted robber.  It just doesn't make any sense."  Id. at 3458–59.

- "I honestly can't explain why counsel took so much time with Miss Phan when it's corroborated by Mr. Brillantes' testimony."  Id. at 3461.

- "What Doctor Melinek needs to add to that statement is:  Experts who are paid $600 an hour to wait in the hallway to tell you people run out of fear.  Okay.  I agree."  Id. at 3465.

- "The other thing about Deputy Valadez that, frankly, I just don't understand."  Id. at 3537.

- "The next possibility.  Ricky Patterson, he's a journeyman.  He's a handyman.  He's skilled in construction.  That must mean that he knows how to tap a lock.  Must mean he's clever enough to use the defendant's garage-door opener to get inside the house.  I thought he broke in?  I agree.  Counsel's here to come up with possibilities, not reasonable doubt."  Id. at 3541.

United States District Court
Northern District of California

1    Petitioner argues that "[a] prosecutor may not express a personal opinion or belief

2   in the guilt of the accused when there is a substantial danger that the jury will view the

3   comments as based on information other than evidence adduced at trial." People v.

4   Mincey, 2 Cal. 4th 408, 447 (1992), as modified on denial of reh'g (May 27, 1992).  The

5   California Court of Appeal reasoned that the prosecutor did no such thing.  The first two

6   statements are not problematic simply because the prosecutor referred to himself,

7   especially where "he was merely presenting his views of the deductions and inferences

8   warranted by the evidence." Appellate Opinion at 35.  The third comment concerning the

9   length of Ms. Phan's testimony and the fact that it assisted the prosecution was "about

10   the strength of the evidence." Id. at 36.  The fourth comment concerning defense

11   expert's testimony simply agreed with one of the expert's sentiments, and finally the last

12   two comments during closing argument "did not express a personal belief in defendant's

13   guilt, imply there were additional facts not in evidence, vouch for the credibility of a

14   witness, or make a personal attack on defendant's trial counsel." Id.

15    The California Court of Appeal's finding that, in context, none of the prosecutor's

16   comments amounted to personal opinions, was reasonable.  The California Court of

17   Appeal based its ruling on a "reasonable argument that counsel satisfied Strickland's

18   deferential standard" (Harrington, 562 U.S. at 105) such that "a fairminded jurist could

19   agree with" the holding (Kayer, 592 U.S. at 120).  And even if constitutional error

20   occurred, petitioner has not shown that it was prejudicial for the reasons described

21   above.  Accordingly, petitioner's claim of ineffective assistance of counsel based on the

22   prosecutor's alleged injection of his personal opinion fails.

23              **(4)    Attacks on Counsel**

24    Petitioner argues that his trial counsel was constitutionally deficient because he

25   failed to object to the prosecutor's attacks on defense counsel.  Specifically, petitioner

26   argues that the prosecutor attacked defense counsel during closing argument, stating:

27              • "He calls that reasonable doubt.  I think he more aptly characterized it in the

28                very beginning of his summation.  His job is just to point out possibilities,

1       whether they are reasonable or not possibilities."  RT 3539.

2        •   "The next possibility.  Ricky Patterson, he's a journeyman.  He's a

3            handyman.  He's skilled in construction.  That must mean that he knows

4            how to tap a lock.  Must mean he's clever enough to use the defendant's

5            garage-door opener to get inside the house.  I thought he broke in?  I

6            agree.  Counsel's here to come up with possibilities, not reasonable doubt."

7            Id. at 3541.

8       Petitioner argues that characterizing potential avenues to find reasonable doubt as

9  alternative "possibilities" fundamentally misstates the role of a defense attorney and

10  denigrates the right to counsel.

11       The California Court of Appeal found that these comments were not improper, as

12  they were made in response to statements by trial counsel, who had told the jury, "My job

13  is to give you possibilities, to give you a perspective, to ask you to look carefully at what

14  the evidence was in this case".  RT 3472.  The appellate court found that the prosecutor's

15  responsive comments did not amount to improper personal attacks on opposing counsel,

16  nor did they accuse counsel of fabricating a defense or deceiving the jury.  Appellate

17  Opinion at 37.  The appellate court also found no ineffective assistance.  Id. at 39.

18       This court agrees.  The California Court of Appeal's conclusion was not

19  unreasonable, as the prosecutor's comments were clearly in response to trial counsel's

20  argument.  Darden v. Wainwright, 477 U.S. 168, 179 (1986) (prosecutor's comments

21  must be evaluated in light of the defense argument that preceded it); United States v.

22  Young, 470 U.S. 1, 11–13 (1985) (no prejudice from argument that is "invited response"

23  to defense counsel's remarks).  Nor did the prosecutor's remarks constitute a personal

24  attack on trial counsel.  See, e.g., United States v. Ruiz, 710 F.3d 1077, 1086 (9th Cir.

25  2013) ("prosecutor's characterization of the defense's case as "smoke and mirrors" was

26  not misconduct"); Williams v. Borg, 139 F.3d 737, 744–45 (9th Cir. 1998) (prosecutor's

27  argument that defense counsel's argument was "trash" was not misconduct).  In addition,

28  because the remarks were not objectionable, the California Court of Appeal reasonably

United States District Court
Northern District of California

1    concluded that trial counsel was not ineffective for failing to object.

2    The California Court of Appeal based its ruling on a "reasonable argument that

3    counsel satisfied Strickland's deferential standard" (Harrington, 562 U.S. at 105) such

4    that "a fairminded jurist could agree with" the holding (Kayer, 592 U.S. at 120).  And even

5    if constitutional error occurred, petitioner has not shown that it was prejudicial for the

6    reasons described above.  Accordingly, petitioner's claim of ineffective assistance of

7    counsel based on the prosecutor's alleged attacks on counsel fails, and Claims 5 and 6

8    are DENIED.

9                          d.        Self-Defense

10                         (1)       The Parties' Arguments

11   Petitioner argues that his trial counsel was constitutionally defective because "he

12   did nothing with the statements of Friendly, Tellez, Coloma and Alcantar" concerning the

13   twenty-four hour period leading up to the homicide.  Pet. at 87–89.  Petitioner argues that

14   counsel should have investigated what statements those potential witnesses would have

15   made, and then called them as witnesses to support a self-defense theory and counter

16   the prosecution's evidence regarding motive.  Specifically, petitioner argues that those

17   witnesses would have testified that Rachal no longer harbored any ill-will toward

18   Patterson concerning the Willoughby job, but that it was only Patterson who harbored

19   animosity.  Id. at 90–92 (citing Rachal Declaration, Pet., Ex. J; Friendly Interview, Pet.,

20   Ex. D at 3699 & 3702).  Petitioner argues that his attorney failed to put on evidence that

21   Patterson had come to his house previously, was driving Rachal's car that day, and was

22   attempting to steal from Rachal at the time of the homicide.  Id. at 89.

23   Petitioner also argues that the state trial court conducting the habeas corpus

24   proceeding and overseeing the associated evidentiary hearing made incorrect credibility

25   determinations when evaluating witness testimony.  Traverse at 25.

26   Respondent argues that counsel did not simply ignore the testimony Patterson

27   identifies.  Instead, trial counsel was aware of the witness statements and discussed

28   whether to call those witnesses with petitioner.  Answer at 56.  The Superior Court

United States District Court
Northern District of California

1  credited trial counsel's testimony that petitioner insisted that no evidence be presented

2  suggesting he had made a sexual advance toward Patterson, and a tactical decision was

3  made not to call those witnesses.  That decision was reasonable, respondent argues,

4  because calling those witnesses would have entailed arguing that they were lying about

5  certain things (e.g., petitioner's sexual advances), but telling the truth about other things

6  (e.g., that petitioner no longer held animosity towards Patterson).  Moreover, calling those

7  witnesses could have exposed testimony about the sexual advances in any event, and

8  could have opened the door to evidence of petitioner's prior sexual crimes that otherwise

9  were not before the jury.[5]

10      With regard to Rachal's feeling about the Willoughby job, respondent argues that

11  because he did not testify at trial there was no way to present evidence of his internal

12  thoughts and feelings about the issue to the jury.  Rachal's habeas petition relies only on

13  his own post-conviction declaration, not testimony that was or could have been presented

14  at trial without him testifying.  See Pet. at 92 (citing Pet., Ex. J).

15      Finally, respondent argues that petitioner has not shown prejudice.  Even if the

16  jury had learned about Patterson's visits to petitioner's house the night before and

17  morning of the stabbing, that evidence would not have overcome the fact that petitioner

18  did not call the police after Patterson's alleged assault, did not tell the neighbors that he

19  had been assaulted by Patterson before he drove away, and asserted that Patterson was

20  the aggressor only after his attempted suicide.  Even still, respondent argues, petitioner

21  clearly used excessive force, even if the jury had believed he was on good terms with

22  Patterson and initially acted in self-defense.

23              **(2)    The Superior Court's Decision**

24      Petitioner's claim presented here was raised in the state habeas petition and

25

26  _____

27  [5] Petitioner's prior offenses included a 1998 felony domestic violence conviction that
   involved a sexual assault on his estranged spouse, and a 1985 indecent exposure
   conviction.  See Declaration of Dennis Alan Lempert, Answer, Ex. 5, Ex. 3, Dkt. 28-3 at
28  ECF p. 560–63 (detailing "a substantial amount of prior bad acts and convictions"); see
   also CT 539–42.

1   addressed at the evidentiary hearing in Superior Court, which rejected the claim.  Pet.,

2   Exs. N & O.  It was then exhausted in the habeas petition in the California Supreme

3   Court, which summarily denied relief.  See Pet., Ex. T.  This court looks through the silent

4   denial and reviews the last reasoned decision by the state court.  Wilson v. Sellers, 138

5   S. Ct. 1188, 1192 (2018).

6          Petitioner testified at the evidentiary hearing that he told trial counsel that

7   Patterson had come to his house the night before and the morning of the stabbing.

8   Evidentiary Hearing Reporter's Transcript of Proceedings Held on December 7, 10, 2018,

9   Pet., Ex. L at 9.  Petitioner had reviewed witness statements obtained by the District

10  Attorney's Office and told counsel that witnesses Steven Friendly, Cora Coloma, Sandy

11  Tellez, Laura Alcantar, and Henry Alcantar would be able to testify about the nature of his

12  relationship with Patterson at the time of the homicide and the fact that Patterson had

13  been to his house the night before and/or the morning of the stabbing.  Id. at 10, 31–33.

14  None of those witnesses had actually been at petitioner's house with Patterson on those

15  occasions; they would only have been able to report what Patterson told them.  Id. at 33.

16         Petitioner acknowledged that the witnesses said in their statements that Patterson

17  told them petitioner had made a sexual advance toward him that morning, which was

18  inconsistent with what petitioner was claiming.  Petitioner asserted, "That part was a lie."

19  Id. at 33–35.  Petitioner nevertheless wanted counsel to call the witnesses to show that

20  Patterson had been at his house that morning, left, and came back.  At the evidentiary

21  hearing, petitioner claimed he didn't care what the witnesses would say about his sexual

22  advances.  Id. at 34–36.

23         Petitioner also thought counsel should have called Tellez because she could show

24  that Patterson was driving petitioner's truck that morning; petitioner acknowledged that

25  Tellez did not actually say that in her statement, but it was petitioner's "theory" that she

26  "almost" said that.  Id. at 39–40.  Petitioner claimed that Patterson had taken his truck

27  without permission that morning, and when petitioner later got into his truck to drive away

28  after the stabbing, he discovered that Patterson had stolen $5,000 in cash from the truck.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Id. at 54–55.  Petitioner acknowledged that none of the witnesses knew anything about

2   that alleged theft.  Id. at 59–60.

3       Trial counsel testified at the evidentiary hearing that he had been provided with

4   statements by Friendly, Coloma, Tellez, and Alcantar by the District Attorney's Office.

5   See Evidentiary Hearing Transcripts, Dec. 10, 2018, Pet., Ex. M at 96.  He did not believe

6   anything in those statements amounted to an affirmative defense for petitioner.  Id. at 97–

7   98.  He did not believe the statements showed that Patterson went to petitioner's house

8   to avenge an unwanted sexual advance.  Id. at 98.

9       Moreover, petitioner did not want the jury to know that he had made a sexual

10  advance toward Patterson.  Id.  "He was very sensitive about his sexuality and the issue

11  of sexuality in this case, and pretty much precluded me from getting into that, other than

12  peripherally."  Id. at 99.  Petitioner told counsel he would fire him if counsel presented

13  that evidence to the jury.  Id. at 99 & 151.  Lempert testified, "He did not want me to

14  present any evidence which would have suggested that he was a participant in any

15  homosexual activity with respect to Mr. Patterson, and to the extent that I didn't, it was

16  because of his instructions to me to that effect."  Id. at 152.  Counsel further explained, "If

17  I felt it was sufficiently strong and absolutely essential, I would have put it in,

18  notwithstanding his opposition.  But I did not want to get into a position of alienation of the

19  attorney-client relationship and to foreclose him from being a participant in the strategy.

20  There were times when we had animated discussions about where we would be going

21  with the evidence, and he was concerned about the appearance of his -- of the potential

22  sexual interest between he and Mr. Patterson, that he did not want that to come into

23  evidence."  Id. at 152–53.  Counsel also was concerned that if that evidence were

24  introduced, it would open the door to evidence of petitioner's prior offenses, which

25  counsel wanted to keep from the jury.  Id. at 99.

26      The Superior Court denied the habeas claim based on petitioner's argument that

27  counsel was ineffective because he did not call the witnesses who had provided

28  statements indicating that Patterson reported being at petitioner's house on the morning

of the stabbing:

> Notwithstanding evidence that Petitioner did not call the police after the victim's alleged assault, did not tell the neighbors that he had been assaulted by the victim before he drove away, and only asserted the victim was the aggressor after his jump (or fall) from the freeway overpass in Santa Barbara County, there was additional justification for not presenting such evidence.
>
> First, at the hearing, Petitioner denied any actions on his part that could be considered a sexual advance toward the victim. He specifically denied pulling his pants down or touching the victim. Second, he testified that any witness who said any sexual advance by him occurred would be lying. Third, Lempert testified that the Petitioner was adamant that no evidence be presented suggesting he made a sexual advance toward the victim. Lempert said that Petitioner threatened to fire him if he tried to offer such evidence. Nevertheless, Lempert stated he would have tried to introduce the evidence that the victim attacked the petitioner in retaliation for a sexual advance if he felt it was sufficiently strong and absolutely necessary, which he did not. Fourth, Lempert said he was concerned that offering evidence the victim was the aggressor would "open the door" to other evidence detrimental to the petitioner's case, such as other crimes the petitioner had committed. These were sound considerations justifying the decision to forego manslaughter instructions.

Sup. Ct. Habeas Decision at 3965–66.

Regarding Rachal's and Patterson's animosity concerning the Willoughby job, the Superior Court denied the habeas claim that counsel was ineffective because he should have presented evidence that petitioner believed the controversy about the Willoughby job had been resolved and he was on friendly terms with Patterson by the time of the stabbing.  The Superior Court observed that trial counsel did try to present such evidence through Kevin Johnson, but the trial court did not allow that evidence to be admitted.  See Addendum to Order Re: Habeas Corpus, Pet., Ex. O at 3972–73; see also RT 2679–84, 2712–16 & 2736–39.  The Superior Court noted that petitioner did not testify at trial about the alleged amicable visits by Patterson, and no one else was present who could have so testified.  See Addendum to Order Re: Habeas Corpus, Pet., Ex. O at 3973.  The Superior Court stated that it was not clear that the insurance company had resolved its investigation into potential fraud in favor of petitioner, or when such an investigation had

88

1    concluded, as petitioner did not provide any supporting documentation.  Id.  The Superior

2    Court also found that petitioner's testimony at the evidentiary hearing was "self-serving

3    and lack[ed] credibility."  Id. at 3974.

**(3)    Analysis**

5        A "doubly" deferential judicial review is appropriate in analyzing ineffective

6    assistance of counsel claims under § 2254.  See Cullen, 563 U.S. at 190 ("We take a

7    highly deferential look at counsel's performance through the deferential lens of

8    § 2254(d)") (internal citations and quotation marks omitted).  "The question is not whether

9    a federal court believes the state court's determination under the Strickland standard was

10   incorrect but whether that determination was unreasonable—a substantially higher

11   threshold."  Knowles, 556 U.S. at 123 (internal quotation marks omitted).  The United

12   States Supreme Court has never required defense counsel to pursue every nonfrivolous

13   claim or defense, regardless of its merit, viability, or realistic chance of success.  Id. at

14   125.  Thus counsel's abandoning a defense that has "almost no chance of success" is

15   reasonable, even if there is "nothing to lose" by preserving the defense.  Id. at 123.

16   Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial

17   conduct on strategic considerations; (2) counsel makes an informed decision based upon

18   investigation; and (3) the decision appears reasonable under the circumstances.  See

19   Sanders, 21 F.3d at 1456.

20       Although petitioner now disagrees with the merits of the decision not to call

21   Friendly, Tellez, Coloma or Alcantar to testify, it is clear that trial counsel in fact based his

22   decision on multiple strategic considerations.  Critically, counsel made a tactical decision

23   when deciding not to rely on witnesses' testimony regarding some facts (e.g., Patterson's

24   visit) while simultaneously arguing the falsity of other statements expected to be

25   consistent across those witnesses (e.g., Rachal's sexual advances during that visit).

26   See, e.g., Sup. Ct. Habeas Decision at 3965–66 ("at the hearing, Petitioner denied any

27   actions on his part that could be considered a sexual advance toward the victim" and

28   "testified that any witness who said any sexual advance by him occurred would be lying");

United States District Court
Northern District of California

1   Evidentiary Hearing Transcripts, Dec. 10, 2018, Pet., Ex. M at 99, 151–53 (petitioner told

2   Lempert that he did not want evidence of any unwanted sexual advances presented to

3   the jury and threatened to fire Lempert should that evidence come in); id. at 99 (Lempert

4   found that petitioner was "very sensitive about his sexuality").  Moreover, calling those

5   witnesses could have exposed testimony about Rachal's sexual advances in any event,

6   and could have opened the door to evidence of petitioner's prior offenses, which included

7   sexual crimes that otherwise were not before the jury.  See, e.g., id. at 99 (Lempert was

8   concerned about opening the door to impeachment evidence against petitioner becoming

9   relevant should the defense attack the victim's character).  These are reasonable

10  considerations for trial counsel to account for when calling even witnesses that may

11  present helpful testimony, as "[a]n attorney need not pursue an investigation that would

12  be fruitless, much less one that might be harmful to the defense."  Harrington, 562 U.S. at

13  108; see also Lord v. Wood, 184 F.3d 1083, 1085 (9th Cir. 1999) ("[I]t is impossible to

14  judge any one piece of evidence without understanding the rest of the case.  Omission of

15  an item of proof may seem foolish until one understands the tradeoffs counsel would

16  have had to make to include it.").  Moreover, where a defendant interferes with his

17  counsel's efforts to present mitigating evidence, he cannot later claim prejudice based on

18  the attorney's failure to investigate and present such evidence.  See Schriro v. Landrigan,

19  550 U.S. 465, 478 (2007) (holding that "it was not objectively unreasonable for [the state]

20  court to conclude that a defendant who refused to allow the presentation of any mitigating

21  evidence could not establish Strickland prejudice based on his counsel's failure to

22  investigate further possible mitigating evidence" in capital case); see also Cox v. Del

23  Papa, 542 F.3d 669, 682–83 (9th Cir. 2008) (counsel's decision not to investigate or

24  present additional evidence regarding defendant's drug use not prejudicial where

25  defendant had continuously and strenuously protested any suggestions that his behavior

26  was the result of his drug use).

27       Petitioner also argues at length about the significance of Patterson positioning

28  Rachal's truck and stealing $5,000 from him, but these arguments largely rely on

90

1    Rachal's post-conviction testimony (which the Superior Court found self-serving and less-

2    than-credible with respect to other topics, and petitioner offers little reason to believe

3    those facts would have been elicited in testimony at trial from the witnesses he argues

4    counsel erroneously failed to call).  See, e.g., Sup. Ct. Habeas Decision at 3966

5    ("Petitioner's testimony is self-serving"); Addendum to Order Re: Habeas Corpus, Pet.,

6    Ex. O at 3974 ("The court finds the testimony of the petitioner to be self-serving and that

7    it lacks credibility."); Pet. at 90; Declaration of Andrew Mark Rachal in Support of Petition

8    for Writ of Habeas Corpus, Pet., Ex. J; RT at 1851–53 (petitioner's handwritten note);

9    Pet, Ex. L at 37–41 (Rachal speculating about his "theory" that Tellez may have testified

10   that Patterson was driving Rachal's truck on the day of the killing).  The same is true of

11   petitioner's argument that the insurance investigation vindicated Rachal of any

12   wrongdoing and accordingly showed there was no "ongoing dispute in late April or early

13   May between Petitioner and Patterson", although petitioner also argues that animosity

14   was ongoing because "Patterson . . . still desired to get back the $5,000 to pay to the

15   Willoughby's".  Pet. at 92–93; see also, e.g., Addendum to Order Re: Habeas Corpus,

16   Answer, Ex. 6, Ex. M at 3, Dkt. 28-5 at ECF p. 126 ("This court does not have the

17   documentation relating to Farmer's Investigation and conclusion, or the date the

18   conclusion was reached, but it is not clear that 'the issues had already been resolved

19   months prior' to the arguments in April, considering the petitioner wasn't interviewed until

20   late February.  Nor is it clear Farmer's resolution was in petitioner's favor, as counsel

21   claims.  The People stated that Farmer's found the claim submitted on behalf of the

22   Willoughby's to be appropriate, not the fraud claim alleged by the petitioner.").

23        Particularly in light of Rachal's stated strong desire to avoid testimony about his

24   sexual advances, a fairminded jurist could agree with the Superior Court's conclusion that

25   declining to call those witnesses constituted an informed and reasonable trial decision

26   based on strategic considerations.  E.g., Sup. Ct. Habeas Decision at 3965–66 ("at the

27   hearing, Petitioner denied any actions on his part that could be considered a sexual

28   advance toward the victim" and "testified that any witness who said any sexual advance

1    by him occurred would be lying"); Evidentiary Hearing Transcripts, Dec. 10, 2018, Pet.,

2    Ex. M at 99, 151–53 (petitioner told Lempert that he did not want evidence of any

3    unwanted sexual advances presented to the jury and threatened to fire Lempert should

4    that evidence come in); id. at 99 (Lempert found that petitioner was "very sensitive about

5    his sexuality").  Since "a fairminded jurist could agree" with the deficiency holding, "the

6    reasonableness of the other [prejudice question] is 'beside the point.'"  Kayer, 592 U.S. at

7    120 (quoting Wetzel, 565 U.S. at 524).

8        Even so, a fairminded jurist could agree with the Superior Court's conclusion that

9    petitioner failed to show that his alleged error was prejudicial.  Even if the jury had

10   learned about Patterson's visits to petitioner's house the night before and morning of the

11   stabbing, that evidence would not have necessarily established the inferences petitioner

12   now posits.  A fairminded jurist could agree with the Superior Court's reasoning that

13   petitioner failed to show it was reasonably likely that a different result would have

14   occurred, especially in light of the evidence presented supporting conclusions that

15   petitioner did not call the police after Patterson's alleged assault, did not tell the

16   neighbors that he had been assaulted by Patterson before he drove away, asserted that

17   Patterson was the aggressor only after his attempted suicide, and used excessive force

18   even if he was defending himself against Patterson.

19       The California Court of Appeal based its ruling on a "reasonable argument that

20   counsel satisfied Strickland's deferential standard" (Harrington, 562 U.S. at 105) such

21   that "a fairminded jurist could agree with" the holding (Kayer, 592 U.S. at 120).  And even

22   if constitutional error occurred, petitioner has not shown that it was prejudicial for the

23   reasons described above.  Accordingly, Claim 8 is DENIED.

24       For the foregoing reasons, petitioner's claims asserting ineffective assistance of

25   counsel—and his derivative claims seeking review of defaulted claims under the "cause

26   and prejudice" standard—fail.

27   **I.    Claim 11:  Whether Cumulative Constitutional Errors Caused Petitioner**

28   **Undue Prejudice**

United States District Court
Northern District of California

1   Petitioner argues that given the totality of the arguments presented to this court,

2   he has demonstrated that the cumulative effect of the many errors in this case

3   demonstrates that the prejudice he faced was not harmless.  Pet. at 101–02; Traverse at

4   32.  Respondent argues that this claim is not cognizable because it was not exhausted,

5   as petitioner did not first raise it in the California Court of Appeal on direct review.

6   Further, respondent argues that because petitioner identifies only a single harmless

7   error— the mistaken instruction on CALCRIM No. 506—there can be no cumulative,

8   synergistic effect from multiple combined errors to support petitioner's claim.

9   First, respondent argues, and petitioner does not dispute, that this claim was not

10   properly exhausted because petitioner did not raise it in the California Court of Appeal on

11   direct review.  Because petitioner "raised his federal constitutional claims for the first and

12   only time to the state's highest court on discretionary review, he did not fairly present

13   them" for purposes of exhaustion.  Casey, 386 F.3d at 918.  Accordingly, this court may

14   not grant petitioner's unexhausted claim unless there is either "an absence of available

15   state corrective process" or "circumstances exist that render such process ineffective".

16   28 U.S.C. § 2254(b)(1).  Petitioner satisfies neither of these prerequisites.

17   Second, on the merits, petitioner's cumulative error argument relies on the

18   argument that multiple errors—where each single error independently is considered

19   harmless—accreted in impact to render his criminal trial fundamentally unfair.  However,

20   petitioner has identified only a single error.  "There can be no cumulative error when a

21   defendant fails to identify more than one error."  United States v. Solorio, 669 F.3d 943,

22   956 (9th Cir. 2012).

23   For the foregoing reasons, this court DENIES Claim 11.  See 28 U.S.C.

24   § 2254(b)(2) (district court may deny a habeas petition on the merits even if it is

25   unexhausted); accord Runningeagle, 686 F.3d at 777 n.10; Jones, 806 F.3d at 544–45.

**CONCLUSION**

27   For the reasons set forth above, Rachal's first amended petition for a writ of

28   habeas corpus is DENIED.  This order fully adjudicates the petition and terminates all

1  pending motions.  The clerk shall close the file.

2  **CERTIFICATE OF APPEALABILITY**

3  To obtain a certificate of appealability, a petitioner must make "a substantial

4  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district

5  court has rejected the constitutional claims on the merits, the showing required to satisfy

6  § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists

7  would find the district court's assessment of the constitutional claims debatable or

8  wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a

9  court granting a COA to indicate which issues satisfy the COA standard.  Here, the court

10  finds that all claims presented by petitioner in the first amended petition—other than

11  Claim 7 which was procedurally defaulted—meet that standard and GRANTS the COA as

12  to all claims with the exception of Claim 7.

13  **IT IS SO ORDERED.**

14  Dated:  February 12, 2024

15  /s/ Phyllis J. Hamilton
16  PHYLLIS J. HAMILTON
    United States District Judge

United States District Court
Northern District of California